MARY B. HEYWARD, PETITIONER, *v.* COMMISSIONER OF INTERNAL
REVENUE, RESPONDENT.
JOHN T. HEYWARD AND HAIDEE M. HEYWARD, PETITIONERS, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 83861, 83862.   Filed July 28, 1961.

*Robert W. Hemphill, Esq.*, and *Paul Hemphill, Jr., Esq.*, for the petitioners.

*James E. Johnson, Jr., Esq.*, for the respondent.

DRENNEN, *Judge:* In these consolidated proceedings, respondent determined deficiencies in income tax against petitioners for the calendar year 1955 in the following amounts:

| Docket No. | Petitioner | Deficiency |
|---|---|---|
| 83861 | Mary B. Heyward | $216.56 |
| 83862 | John T. Heyward and Haidee M. Heyward | 673.24 |

The only issue is whether petitioner Mary B. Heyward and petitioner John T. Heyward realized income by reason of occupying rent free two houses owned by Winnsboro Granite Corporation (hereafter called Winnsboro Granite) and by reason of Winnsboro Granite's furnishing fuel oil for the houses occupied by them.

FINDINGS OF FACT.

Some of the facts have been stipulated and are found as stipulated.

Mary B. Heyward was unmarried and resided in Rion, South Carolina, during the taxable year 1955. She filed an individual Federal income tax return, Form 1040, for the taxable year 1955 with the director of internal revenue for the district of South Carolina, reporting compensation from Rion Crush Stone Corporation in the amount of $4,800 and dividends from Winnsboro Granite in the amount of $412.

John T. Heyward and Haidee M. Heyward were husband and wife during the taxable year 1955 and they resided in Rion, South Carolina. They filed a joint Federal income tax return, Form 1040, for the taxable year 1955 with the director of internal revenue for the district of South Carolina.

740

John and Mary are brother and sister.

Winnsboro Granite is a South Carolina corporation, organized many years ago for the purpose of operating granite quarries. In 1955 there were 1,050 shares of stock of the company issued and outstanding, owned as follows:

| Name of stockholder | Number of shares owned | Name of stockholder | Number of shares owned |
|---|---|---|---|
| John T. Heyward | 595¾ | Helen W. Hemphill | 137 |
| Mary B. Heyward | 41¼ | Robert W. Hemphill | 1 |
| Julia W. Johnston | 137 | Paul Hemphill | 1 |
| Reita W. Witherspoon | 137 | | |

The company has been run by the Heyward family since 1903. John has been president of the company since 1941 but Mary was not an employee of Winnsboro Granite. During the year 1955 the quarrying operations of the company were conducted at its Anderson quarry located about 10 miles northwest of Rion, South Carolina, and about 15 miles due west of Winnsboro, South Carolina. Rion is about 25 miles north of Columbia, South Carolina. The offices of Winnsboro Granite are located at the Anderson quarry. The quarry is not usually operated at night and the office is not open at night.

Rion Crush Stone Corporation is a wholly owned subsidiary of Winnsboro Granite and operates a stone-crushing plant at Rion, at an old quarry originally operated by Winnsboro Granite. John is in charge of the operations of both Winnsboro Granite and Rion Crush Stone Corporation. He is also president of Heyward Granite Company, located at Graniteville, Missouri. John makes several trips daily between the Anderson quarry and the crushing plant at Rion. He also makes trips to Heyward Granite Company occasionally.

Winnsboro Granite owns about 3,000 acres of land stretching over an area of about 10 miles encompassing the Anderson quarry, the Rion stone-crushing plant, and the unincorporated village of Rion. The company owns about 50 or 60 houses on this property, some of which are located at Anderson quarry and some of which are located at Rion. Most of these houses are occupied by key employees of the company rent free, in accordance with a long-established policy of the company to have employees live on the company property for its protection and for convenience to the jobsite. The remainder of the company houses are unoccupied.

Rion is an unincorporated village of about 30 houses, 22 or 23 of which are owned by Winnsboro Granite, and 3 or 4 of which are vacant. There were no paved streets, street lights, public buildings (except a post office), stores, local police or fire protection, or any of the other public facilities generally found in an incorporated community. There were no telephones in Rion in 1955 although there were 10 or 11 at the time of trial. There is considerable noise and dust in Rion from the stone-crushing plant located nearby. Rion is not a

desirable place to live for anyone not connected with either Winnsboro Granite or Rion Crush Stone Corporation.

In 1955 John lived in a house owned by Winnsboro Granite in Rion, about one-fourth of a mile from the stone-crushing plant. He had lived in this house since 1941, when he became president of Winnsboro Granite on the death of his brother. The main part of the house was frame and was built in the late eighties or the early nineties. The house had 10 rooms (a living room, a dining room, a kitchen, 6 bedrooms, and a gallery) and 3 baths. The gallery was constructed as an addition to the house by Winnsboro Granite after John moved into the house and was built of Winnsboro blue granite, a product of the Anderson quarry. It was built at a cost of about $50,000 as an advertisement for Winnsboro Granite's product and is used primarily for display. Many photographs have been made of the gallery for advertising the Winnsboro blue granite, which is called "the silk of the trade." The gallery includes a chimney, a mantelpiece, steps, a terrace, and three arches, all made of granite, and is known throughout the monumental stone business. John at times held conferences at the house with persons dealing with Winnsboro Granite and received customers there for purposes of entertaining and advertising. John paid no rent for the house, and all improvements, repairs, utilities, and maintenance expenses were paid for by Winnsboro Granite, which also paid $403.20 in 1955 for fuel oil used in the house.

Mary has lived on the Winnsboro Granite property since 1903. In 1955 she lived in a house in Rion owned by Winnsboro Granite. This house was formerly a 3-car garage until 1933 when a floor was put in it and it was made into a 5-room dwelling. It had a dining room, a living room, a kitchen, one room built on the back and used as a bedroom, and a bedroom in the attic. Part of the house is still used as a garage. Mary paid no rent for this house, and all repairs, utilities, and maintenance expenses were paid for by Winnsboro Granite, which also paid $263.92 in 1955 for fuel oil used in the house.

One of the houses owned by Winnsboro Granite is Heyward Hall, an 8-room house with considerable historical value located about 4 miles from Rion. About 3 years ago this house became vacant. Winnsboro Granite wanted the house occupied, and John contacted a realtor in Columbia, South Carolina, to find a tenant for it. No rental price was put on it because John first wanted to get someone interested in it and then some rental arrangement would be worked out. Rent was not the primary consideration. However, the house has remained vacant and in the 3 years that it has been available nobody has shown any interest in it. In the same general area is a 6-room house which the owner has been trying to rent through a realtor, but no interest has been shown in it and it is vacant. Very few, if any, houses in Rion are rented.

Winnsboro Granite has never charged rent to any of the employees who occupy the houses owned by it. Neither John nor Mary was expressly required by Winnsboro Granite or Rion Crush Stone Corporation to live in the houses they occupied in 1955 and neither of them had any specific agreement with Winnsboro Granite with reference to occupancy of the houses rent free.

The fair rental value of the house occupied by John and his family in 1955 was $100 per month and of the house occupied by Mary in 1955 was $50 per month. Neither John nor Mary was required to live in these houses in 1955 as a condition of his or her employment or for the convenience of his or her employer. Neither the fair rental value of the houses nor the fuel oil furnished was a gift by Winnsboro Granite to John or Mary.

OPINION.

Respondent determined that the fair rental value of the houses owned by Winnsboro Granite and occupied by John and Mary in 1955, determined to be $1,200 and $600, respectively, and the cost of the fuel oil furnished by Winnsboro Granite in 1955 for use in the two houses were taxable income to John and Mary. Respondent relies on the inclusive terms of section 61(a) of the Internal Revenue Code of 1954,[1] defining gross income, and the broad definition of gross income in *Commissioner* v. *Glenshaw Glass Co.*, 348 U.S. 426 (1955), and on section 301(c) to include these amounts in the gross income of petitioners.[2] Petitioners rely primarily on the "convenience-of-employer" rule now embodied in section 119 to exclude these amounts from gross income but also claim that even if the amounts are not excludible under section 119, the two houses had no fair rental value that could be taxed to them. Petitioners also suggest that the amounts involved may have been gifts from the corporation and thus nontaxable to petitioners.

Section 119 provides in part:

There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if—

*     *     *     *     *     *     *

(2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment.

This section for the first time specifically excluded from gross income by statute the value of such meals and lodging. The provision was "designed to end the confusion as to the tax status of meals and lodging furnished an employee by his employer" (see H. Rept. No. 1337, to

---

[1] All section references are to the 1954 Code unless otherwise indicated.

[2] In the notices of deficiency, respondent characterized both items simply as additional income from Winnsboro Granite, but included the cost of fuel oil only as dividends in computing the dividends-received credit of both petitioners.

accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 18 (1954)) which had resulted from conflicting court decisions and the regulations and rulings of the Commissioner dealing with the subject. In explaining the reason for an amendment to the House version of the provision, the Senate Finance Committee reported (see S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 19 (1954)) that it had "provided that the basic test of exclusion is to be whether the meals and lodging are furnished primarily for the convenience of the employer (and thus excludable) or whether they were primarily for the convenience of the employee (and therefore taxable)." The statement of the managers on the part of the House, attached to H. Rept. No. 2543, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., p. 26 (1954), emphasized that lodging furnished for the convenience of the employer is excluded from gross income "but only if * * * the employee is required to accept such lodging on the employer's business premises as a condition of his employment."

Section 1.119–1(b), Income Tax Regs., provides as follows:

(b) *Lodging.* The value of lodging furnished to an employee by his employer shall be excluded from the employee's gross income if three tests are met: (1) The lodging is furnished on the business premises of the employer, (2) the lodging is furnished for the convenience of the employer, and (3) the employee is required to accept such lodging as a condition of his employment. The phrase "required as a condition of his employment" means required in order for the employee to perform properly the duties of his employment. The exclusion shall apply irrespective of whether under an employment contract or a statute fixing the terms of employment such lodging is furnished as compensation.

This provision in the regulation that the phrase "required as a condition of his employment" means required in order for the employee to perform properly the duties of his employment was also contained in Mim. 5023, 1940–1 C.B. 14, explaining amendments to prior regulations dealing with the subject. See *George I. Stone*, 32 T.C. 1021 (1959). This particular language appears to have been accepted by the courts and used by them in determining whether lodging furnished by an employer met the test of being furnished for the convenience of the employer so as to be excludible. See *William I. Olkjer*, 32 T.C. 464 (1959); *Jones* v. *United States*, 60 Ct. Cl. 552 (1925).

We are not here concerned with issues that have arisen in earlier cases, particularly those decided prior to enactment of section 119, such as whether the rental value was compensatory, whether the employee was charged for the rental, and whether a partner could qualify under the convenience-of-employer rule. While respondent makes a brief argument that the two houses were not on the *business* premises of Winnsboro Granite, that is, at the quarry site, we think the issue under section 119 must be decided on whether the lodging was furnished for the convenience of the employer with the employee being required to accept it as a condition of his employment.

In the light of the case law on the convenience-of-employer rule and the legislative reports discussing the purpose and intent of section 119, in our opinion, the phraseology used in the statute, "required to accept such lodging * * * as a condition of his employment" includes the requirement that the lodging be occupied by an employee in order to perform properly the duties of his employment. There may be various reasons why occupancy of lodging on the employer's premises is necessary for the employee to properly perform his duties, such as remoteness of the jobsite and unavailability of other lodging, see *William I. Olkjer, supra; George I. Stone, supra;* or because the employee's presence on the business premises at all times was a part of his job, see *Arthur Benaglia,* 36 B.T.A. 838 (1937) ; *Greene v. Kanne,* an unreported case (D. Hawaii 1938, 23 A.F.T.R. 1141, 38–1 U.S.T.C. par. 9206) ; or possibly because the employer demands it for reasons of his own. But if as a practical matter, whether by contract or by circumstances, the employee's occupancy of the lodging furnished by his employer is necessary in order for the employee to perform properly the duties he is employed to perform, we believe the rental value of the lodging is excludible from his gross income under section 119. On the other hand, if the duties the employee is employed to perform do not require his occupancy of the lodging furnished by the employer, but the employer appears to have lodging available and it seems more desirable that the employee occupy the premises, we do not think the value of the lodging is excludible from gross income under section 119.

We do not decide whether section 119 would apply to a situation where the employer insists that an employee occupy lodging on the employer's premises, even though there is no apparent connection between occupancy of the premises and the performance of the employee's duties, because we are not faced with that situation here. However, such cases can probably be best decided by examining carefully the bona fides of the employer's demand.

Here section 119 would apparently not apply in the case of Mary because she was not an employee of Winnsboro Granite, but the same reasoning which forces us to conclude that section 119 does not apply to John would also require us to conclude that section 119 would not apply to Mary either, even if she were an employee of Winnsboro Granite.

The evidence indicates that there was no agreement, express or implied, between John and Winnsboro Granite that John live in this house owned by Winnsboro Granite as a condition of his employment. Nor is there any evidence that the proper performance of John's duties as president of the company required his occupancy of the house. In answer to a question on cross-examination as to whether he would be president of the company if he lived in that house or not, John answered, "I believe if I left, I wouldn't be President any longer."

This is the only direct evidence on this point and even that testimony is equivocal. While the evidence indicates that it was a policy of the company to try to have employees live on the property to help protect it, there is no evidence that this was required as a condition of employment of any employee. In fact, the general manager of the Rion Crush Stone Corporation testified that he lived at Rion during the war years when houses were hard to find but moved to Winnsboro in 1958. It seems quite unlikely that the president of this company, particularly when he had voting control of the company, would be required to live on the company property had he desired to live elsewhere. It seems more likely that when John came back to take over management of the business when his brother died, it was only natural that he would move into one of the houses which the company had available as his predecessors had done. This may have been of some benefit to the company; but it also served John's convenience and was a benefit to him. John testified, in answer to a question whether he, as president, had to be on the property for protection and other purposes, that "We certainly think it is desirable."

There is no evidence that a company house on company property was the only place John could have lived to perform his duties. Operations were not conducted at night and the office was not open at night, so there is little to indicate that John's presence on company property was required at all times. It is true that it was a company policy to try to have employees live on the property to help protect it—but there is no evidence that any attempts were ever made to damage company property or that John was ever called upon to protect it. The operations of the company were not so remote from civilization in 1955 as to require the company to provide lodging on its property to keep its employees on the job. It appears that John did entertain customers in his house occasionally and that the $50,000 stone gallery was used for advertising purposes. But these things did not require that John live on the property. These functions could have been performed had the gallery been separate from the house and had John lived elsewhere. There is no showing of any necessity that John live in Rion either because his duties required it, or because of physical circumstances, or because of the demands of his employer.

Petitioners place considerable reliance on the fact that Rion is not a desirable place to live and that few people would live there by choice. However, there was no convincing evidence that if an employee of Winnsboro Granite had a choice of living in Rion rent free or living in Columbia or someplace else where he had to pay rent and commute to and from work, he would not choose Rion. But, in any event, it seems to us that that evidence goes more to the value of the lodging furnished rather than to whether the employee lived at Rion primarily as a convenience to his employer or as a condition of his employment.

We conclude from the evidence presented that neither John nor Mary lived in the houses they occupied in 1955 for the convenience of the employer or as a condition of their employment, and that the fair rental value of the lodgings is not excludible from their gross income under section 119. *Dean* v. *Commissioner*, 187 F. 2d 1019 (C.A. 3, 1951), affirming a Memorandum Opinion of this Court; *Chandler* v. *Commissioner*, 119 F. 2d 623 (C.A. 3, 1941), affirming 41 B.T.A. 165 (1940); *Charles A. Frueauff*, 30 B.T.A. 449 (1934).

Petitioners suggest that the lodgings were gifts from the corporation and therefore the rental value thereof did not constitute income to John or Mary. There is no evidence to support this suggestion and we will not assume that the officers and directors of Winnsboro Granite gave away as a gratuity the right to occupy company property. *Chandler* v. *Commissioner, supra.* See also *Commissioner* v. *Duberstein*, 363 U.S. 278 (1960); *Estate of Mervin G. Pierpont*, 35 T.C. 65 (1960), on appeal (C.A. 4, 1961).

No issue is raised as to the character of the income to petitioners, if income there be—whether it was compensation for services, dividends, or some other type of income—and we make no effort to so characterize it. Suffice it to say that the value of lodgings furnished rent free and the cost of fuel oil used therein fall within the broad definition of gross income "from whatever source derived" in section 61 of the Code and there being no applicable provision of the Code which would exclude them from income, we find that the fair rental value of the houses occupied by John and Mary and the cost of the fuel oil furnished for those houses are taxable income to John and Mary in 1955.

Petitioners contend that the two houses had no fair rental value and therefore there was no income which could be taxed to them. There is evidence that Rion is not a desirable place to live, that few people would live there of their own choosing, that there are no municipal facilities to attract people, that few, if any, houses have been rented in Rion in recent years, and that efforts were made to rent at least two houses in the vicinity in recent years without success. While this would indicate that there is little rental value to houses in Rion to people who are not connected with and working for one of the two companies, it does not prove that there is no rental value to houses in Rion to people who work there or near there. Certainly there is a benefit to a person connected with these companies to have provided for them a 9-room, 3-bath house (exclusive of the gallery which appears to have been used primarily for advertising purposes) and a 5-room house which they would have had to provide for themselves otherwise, whether in Rion or elsewhere. In fact, it seems clear to us that John, taking everything into consideration, chose to occupy this house in Rion rent and upkeep free rather than pay for his own lodging else-

where, and certainly there was nothing that required Mary to live at Rion except personal reasons of her own.

There was no expert evidence offered on the fair rental value of these two houses. A real estate dealer from Columbia did testify for petitioners that, at the request of Winnsboro Granite, she had attempted, without success, to find a tenant for Heyward Hall, a house of some historical value comparable in size and location to John's house. But when asked what she considered the fair rental value of Heyward Hall to be, she said $250 per month in Columbia but only $100 per month in Rion. To some extent this supports the respondent's determination of the fair rental value of John's house.

Respondent's determination of these values is presumed to be correct and the burden of proof is on petitioners to show it is wrong. Rule 32, Rules of Practice of the Tax Court. On the evidence presented we do not think the values determined by respondent were arbitrary or unreasonable. We have found as fact that the fair rental value of John's house was $100 per month and of Mary's house was $50 per month, and such findings are determinative of this issue.

*Decisions will be entered for the respondent.*

