Lloyd E. Peterson and Lorrayne Peterson [1] v. Commissioner. Peterson Farms, Inc.[1] v. Commissioner. Peterson v. Commissioner
Docket Nos. 1173-63, 1174-63.
United States Tax Court
T.C. Memo 1965-255; 1965 Tax Ct. Memo LEXIS 76; 24 T.C.M. (CCH) 1383; T.C.M. (RIA) 65255; September 21, 1965
W. H. Enfield and Max Myers for the petitioners. Edward E. Pigg for the respondent. KERN
Memorandum Findings of Fact and Opinion In Docket No. 1173-63 respondent determined deficiencies in income tax against petitioners Lloyd E. Peterson and Lorrayne Peterson as follows: Taxable Year Ended
Amount
March 31, 1958
$3,902.75
March 31, 1959
9,810.13
March 31, 1960
8,648.78
In Docket No. 1174-63 respondent determined a deficiency in income tax against Peterson Farms, Inc., as follows: Taxable Year Ended
Amount
March 31, 1959
$1,783.10
The two cases have been consolidated for hearing and opinion. In his statutory notice of deficiency addressed to petitioners Lloyd E. Peterson and Lorrayne *78 Peterson respondent determined that the petitioners had received during the taxable years unreported dividend income representing the value of board and lodging furnished them by their employer, Peterson Farms, Inc., a corporation controlled by Lloyd E. Peterson, sometimes hereinafter referred to as petitioner. Respondent determined that petitioner was not required to live on the business premises of the corporation for the "convenience of the employer" and that the arrangement under which they received such board and lodging was not arrived at by an arm's-length transaction. If we find that these items should have been included in petitioners' gross income, we must determine the value of the food and lodging as furnished to petitioner by his controlled corporation of which he was president. Respondent's computation relating to the value of the food and lodging furnished the petitioners by their employer are as follows: Year ended March 31, 1958
Cash expenditures made by corpora-
tion: Guest House Expenses $2,388.00
Less: Amount determined
to be capital expendi-
ture (1,627.72)
$ 760.28
Guest House Labor
1,497.00
F.I.C.A. Tax on Guest House La-
bor
43.68
Total applicable cash expenses
$ 2,300.96
Fair rental value of assets furnished: Guest House
$ 4,813.32
Furniture
911.71
Total expenses and rental value
$ 8,025.99
Amount attributable to your family
(Determind to be Dividend)
$ 6,420.79
Year ended March 31, 1959
Cash expenditures made by corpora-
tion: Guest House Expenses $3,779.92
Less your personal gro-
ceries (790.34)
$ 2,989.58
Guest House Labor
3,120.50
F.I.C.A. Tax on Guest House
Labor
71.97
Cash reimbursements
1,634.82
Total applicable cash expenses
$ 7,816.87
Fair rental value of assets furnished: Guest House
$ 8,290.01
Furniture
2,122.95
Total expenses and rental value
$18,229.83
Amount attributable to your family
$14,583.87
Add personal expenses eliminated
above
790.34
Total determined to be Dividend
$15,374.21
Year ended March 31, 1960
Cash expenditures made by corpora-
tion: Other Guest House Expenses
$ 3,775.34
Guest House Labor
3,750.65
F.I.C.A. Tax on Guest House
Labor
89.45
Cash reimbursements
1,231.46
Total applicable cash expenses
$ 8,846.90
Fair rental value of assets furnished: Guest House
$ 8,326.89
Furniture
2,158.93
Total expenses and rental value
$19,332.72
Amount attributable to your family
$15,466.18
Total determined to be Dividend
$15,466.18
*79 In his statutory notice of deficiency addressed to petitioner Peterson Farms, Inc., in Docket No. 1174-63, sometimes referred to herein as "Farms," respondent determined that the depreciation claimed on certain items in 1959 in the sum of $21,763.29 was allowable only in the sum of $15,442.35 and consequently disallowed $6,320.94 of the claimed depreciation. While petitioner Farms alleged error as to this determination, no evidence was introduced and no argument was made on brief with regard thereto. Respondent further determined that the cash expenditures and depreciation relating to the officers' guest house claimed by Farms for 1959 in the amount of $18,295.94 were allowable only in the sum of $3,738.12. Respondent determined that this latter amount constituted an ordinary and necessary business entertainment expense. A schedule of the full amount of the cash expenditures and depreciation claimed by Farms with respect to the officers' guest house is as follows: Guest house expense
$ 3,779.92
Guest house labor
3,120.50
F.I.C.A. tax on guest house labor
71.97
Depreciation on guest house
6,810.21
Depreciation on guest house furni-
ture
2,878.52
Lloyd E. Peterson reimbursements
1,634.82
Total
$18,295.94
*80 Similar determinations for the fiscal years ended March 31, 1958, and March 31, 1960, were made by respondent. These years are involved because of the implications of certain carryback and carryover losses from those years to the year before us. Our decision for the fiscal year ended March 31, 1959, will occasion the appropriate computations of these losses under Rule 50. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein and made a part of our Findings by reference. The petitioners, Lloyd E. and Lorrayne Peterson, are husband and wife, and reside on the premises of Peterson Farms, Inc., in Decatur, Arkansas. They filed their joint Federal income tax returns for the taxable years ended March 31, 1958, March 31, 1959, and March 31, 1960, with the district director of internal revenue at Little Rock, Arkansas. Both are officers and employees of petitioner Peterson Farms, Inc.
The petitioner Peterson Farms, Inc., is a corporation which was organized on September 1, 1957, under the laws of the State of Arkansas under the name of Peterson Breeding Farms, Inc. In 1962 it changed *81 its name to its present title. The formation of Peterson Farms, Inc., was accomplished through a spin-off from Peterson Produce Company under section 355 of the 1954 Code. Peterson Farms, Inc., also filed its Federal income tax returns for each of the years ended March 31, 1958, March 31, 1959, and March 31, 1960, with the district director of internal revenue at Little Rock, Arkansas. Farms kept its books and filed its income tax returns on a cash basis, with its taxable year ending March 31. The original corporation, Peterson Produce Company, began experimental work on the production of meat-type breeding male poultry (known as cockerels) in the late 1940's on a farm in northwestern Arkansas. After the corporate division in 1957 the breeding work was carried on exclusively by Peterson Farms, Inc.
The cockerels produced by Farms are used primarily by poultry growers to produce meat-type poultry for sale as broilers. The large majority of cockerels sold by Farms are sold as day-old chicks to poultrymen who grow them to breeding age, and mate them with breeding hens for the production of eggs used to produce a meat-type broiler chicken. The pullets and unsold cockerels are grown *82 into broilers by Farms. During the years in question the capital stock ownership of Peterson Farms, Inc., was as follows: Lloyd E. Peterson
298 shares
Lorrayne Peterson
(Wife of Lloyd)
1 share
Hattie Peterson
(Mother of Lloyd)
1 share
The officers and directors of Farms were as follows: Lloyd E. Peterson - President, Director, Hattie Peterson - Vice President, Lorrayne Peterson - Secretary-Treasurer, Director W. H. Enfield - Director, F. R. L. Tuthill - Director, Kirk Hale - Director, Dana Reynolds - Director, Max Myers - Director For several years prior to September 1, 1957, Lloyd E. and Lorrayne Peterson lived in a 6-room house in Decatur, Arkansas, a town with a population of 415. This house was worth somewhere between $10,000 and $15,000. In the early or middle part of 1955 Lloyd E. Peterson approached Paul Young, an architect, and requested him to design a residence to be constructed on land owned jointly by petitioner and his wife, and surrounded on three sides by land used by Peterson Farms, Inc., and its predecessors. At first, no particular cost estimates were made, although the architect's fee was set on an assumed construction cost of $60,000, *83 excluding landscaping and furniture. On July 21, 1956, according to its minutes, the board of directors of Peterson Produce Company discussed the possibility of constructing quarters to be used for accommodating business visitors. This was after the construction of the residence in question had commenced. The president, Lloyd E. Peterson, was asked to have a long-term lease prepared covering the property upon which the residence was being constructed. Pursuant to this request, Peterson leased the property which he and his wife owned and upon which the new house was being constructed to the Peterson Product Company on August 21, 1956, for a term of 25 years at a rent of $444.31 per month. The lease provided, inter alia, as follows: It is mutually agreed that the improvements which have been previously constructed and placed on the property by Lessees and other improvements which may be constructed and placed on the property of Lessors by Lessee hereafter shall remain the property of Lessee and may be removed by Lessee at the end of the term hereof or any extensions or renewals hereof, provided that said improvements can be removed without substantial damage to the land. On April 1, 1959, the *84 land was transferred by Peterson and his wife to an irrevocable trust for the benefit of their daughter Debra. Title to the land is to pass to her when she reaches the age of 21. On August 20, 1957, the board of directors of the Produce Company reemployed Peterson as president. The minutes of that meeting set forth the fact that Peterson was to "live in the business guest house" as "a condition of his employment" in order to entertain business visitors. The property on which the residence for the Petersons was being constructed was adjacent to the western part of the premises of Farms. Immediately to the northeast the house faced the business airport operated by Farms and a body of water known as Crystal Lake. A large group of poultry and cockerel range houses was located to the south and east of the residence. Construction was done by Peterson Produce Company's construction crew, which in the past had built chicken and poultry range houses. The work on the residence took 18 months and was completed in the late summer of 1957. The Petersons assumed residence in the new house in September 1957. The Peterson house was an L-shaped ranch style structure consisting of two guest rooms *85 which shared a bathroom, two bedrooms, each with its own bathroom, a formal living room and dining area, a casual living room and family dining area, a kitchen, utility room, additional bathroom, porch, patio, and carport. The porch and patio faced northeast toward the airport and the lake. A new type of baseboard radiant heating and air conditioning system was installed in the house. A considerable number of customers, prospective customers, and others having business to transact with Farms visited the premises of Farms during each year, some from distant parts of this country and a few from foreign countries. There were no adequate facilties in Decatur or its immediate environments for entertainment of these business visitors of Farms. The closest town to Decatur, Arkansas, with a population of more than 1,000 is Siloam Springs, which is 15 miles away to the south. The Hereford Motel, a facility with six units at the time of the construction of the guest house in question, was located in Siloam Springs. It had no restaurant and no conference rooms. Other motels and hotels in the area at that time were the Bentonville Court (in Bentonville, Arkansas), which was 16 miles from Decatur *86 and had no restaurant; the Betty-Ann Court (which had no restaurant); the Hotel Arkansas and the Blue Bonnet Motel at Rogers, Arkansas, 23 miles from Decatur; and the Starlight Motel, the Bell Aire Motel, Authur Murray's Motel, and the Palace Motel at Noel, Missouri, 15 miles from Decatur. The primary purpose of all of the petitioners in causing the home to be constructed and furnished was to provide a residence for the Petersons. However, 25 percent of the area and facilities of the house was intended for use and was used in the entertainment of business guests of Farms. Accordingly, the residence in question and its furnishings were assets used in the trade or business of Farms for the entertainment of customers and other business guests to the extent of 25 percent of the cost thereof. Lorrayne Peterson paid the bills for the construction of the residence and was reimbursed by Peterson Produce Company. When Peterson Farms, Inc., was spun off out of Peterson Produce Company, the house was carried on the books of Farms at a cost figure of $106,281.92 and the furnishings at $11,585.10. Following the completion of the residence, Lloyd E. Peterson paid Peterson Produce Company $9,166.42, *87 as representing his computation of the pro rata cost of constructing a bedroom and bathroom in the house for his daughter Debra. Two of the bedrooms were specifically set aside for guests, and occasionally the daughter's bedroom was used for guests. Subsequent additions to the guest house and its furnishings have brought the furnishings account to $16,054.12 and the account representing the cost of the house to $107,818.82. These figures are as of March 31, 1960. The duties of Lloyd E. Peterson consisted of supervising the various activities of Farms. These included the cockerel experimental and control laboratory, the poultry disease eradication research, planning new production facilities, and management of the employees. With respect to the selection of poultry for breeding, Peterson personnally chose all of the males and females paired for breeding. The latter task was of paramount importance because the goal of Farms was to produce a disease-resistent strain which would be capable of creating future generations of healthy poultry. Peterson was also charged with the responsibility of entertaining important business customers and suppliers. In 1959 Peterson Farms, Inc., paid *88 to Lloyd E. Peterson the sum of $790.34 in order to reimburse him for expenditures he incurred for certain personal groceries. At the time of trial Peterson acknowledged that this amount was erroneously paid to him by the corporation. However, he had never repaid it to the corporation. In the statutory notice of deficiency to Peterson Farms, Inc., respondent determined that the corporation expended certain amounts in operating the residence and allowed a deduction of a portion of these amounts as follows: Guest
House
Guest
Operations
House
(Gross
Expense
Year Ended
Amount)
(Allowed)
March 31, 1958
$3,928.68
$1,697.04
March 31, 1958
8,607.21
3,738.12
March 31, 1960
8,846.90
3,739.28
Although respondent allowed a portion of the guest house expense deductions, he disallowed all of the depreciation deductions with respect to the guest house. In so doing he did not question that the expenditures were made, nor that the depreciation was sustained, but took the position that the larger part of the operational expense deductions did not constitute ordinary and necessary business expenses of the corporation and that none of the depreciation deductions *89 constituted a reasonable allowance for exhaustion for property used in its trade or business. The depreciation deductions claimed on the guest house and furnishings by Farms were as follows: Guest House
Year Ended
Depreciation Claimed
March 31, 1958
$5,484.77
March 31, 1959
9,688.73
March 31, 1960
8,186.84
The Petersons used the house for the entertaining of business and nonbusiness guests. Frequently people stayed overnight in the house. Lorrayne Peterson maintained a guest book and visitors' register in the house for guests. Included in this record were personal guests and relatives of the Petersons as well as business guests. Petitioners' guest records indicate the following with regard to overnight visitors: Nights
Total
Total
Guests in
Guest
Guests
Year ended
Residence
Nights
Housed
March 31, 1958
30
66
56
March 31, 1959
58
130
94
March 31, 1960
39
73
50
It was conceded by petitioners that "[business] guests would normally not stay [in the house] on either Saturday or Sunday night. They probably would not stay on Friday nights either but they might." A considerable number of business overnight *90 guests are included in the above figures. However, the exact number is not disclosed by the record. The Petersons had the services of Cleo Whitfield and his wife in taking care of the house. His wife did the general cleaning in the house and he maintained the grounds about the house, the airport grounds, and opened and closed the gates to the company roads. The fair rental value of the premises in question, occupied and used by the Petersons, was not less than $400 per month during the taxable years. The schedules attached to the income tax returns of Farms show that the "Earned Surplus" account at the end of the fiscal year 1958 was $3,866.92 and that the "Retained earnings" accounts at the end of the fiscal years 1959 and 1960 were in the amounts of $10,566.47 and ($72,112.76), respectively. Lloyd E. and Lorrayne Petersons' joint income tax returns for the fiscal years 1958, 1959, and 1960 indicate that the total wages paid to Lloyd Peterson by Farms were in the amounts of $38,607.40, $66,006.16, and $64,250, respectively. Opinion KERN, Judge: The principal questions presented for our decision are: (1) Whether the whole or any part of the value of the food and lodging *91 furnished petitioners Lloyd E. and Lorrayne Peterson is excludable from their gross income under section 119 of the 1954 Code, and (2) whether the deductions which Peterson Farms, Inc., claimed relating to expenses of maintaining a guest house and depreciation thereof, in which petitioners Lloyd E. and Lorrayne Peterson lived, are properly considered in whole or in part "ordinary and necessary expenses" of a trade or business and a reasonable allowance for exhaustion under sections 162(a) and 167 of the 1954 Code. Section 119 [2] has two tests for determining whether the value of meals furnished to an employee is excludable from gross income. They are that the meals be furnished on the business premises of the employer and that they be furnished for the convenience of the employer. See section 1.119-1(a), Income Tax Regs. The statute and regulations add a third test in the case of lodging furnished by the employer - that the employee be required to accept the lodging as a condition of employment. See section 1.119-1(b), Income Tax Regs.
*92 Petitioners argue that the instant cases come within all of the tests of both the statute and regulations. They urge that the house was constructed in the heart of the property of Farms and that it was adjacent to the location of Lloyd E. Peterson's work. They point out that the board of directors of Farms had determined that a facility of this type was necessary in order to entertain business prospects because of the lack of overnight accommodations in the area. Moreover, they contend that petitioner's supervision of the cockerel pedigree work required that he closely observe the bird selection process during "all hours of the day and night during the selection period" and that his residence "in the business guest house" was prescribed by the board of directors of Farms "as a condition of [Lloyd Peterson's] employment." In support of their position petitioners cite William I. Olkjer, 32 T.C. 464, and Arthur Benaglia, 36 B.T.A. 838. Respondent contends that the record establishes that the services performed by petitioner were of a supervisory nature which could be adequately performed even if he had not lived on the business premises of Farms. Moreover, *93 he urges that the resolutions of the board of directors of Farms with regard to the house and Lloyd Peterson's residing therein as a condition of his employment do not constitute proof of the fact that the Petersons were required to live in the guest house as a condition of Peterson's employment, because the board of directors was completely dominated by Peterson on account of his controlling stock interest. In support of his contention, respondent cites the language used by this Court in its opinion, in Mary B. Heyward, 36 T.C. 739, affd. per curiam, 301 F. 2d 307. Our Findings have set out the nature of petitioner Lloyd E. Peterson's work for Peterson Farms, Inc. His own testimony established that he supervised the entire operation of the business, and that he paid especial attention to the breeding process and the selection of birds. He made every individual decision with regard to the breeding process. Although it is clear from the record that the facility in question was on the "business premises" of the employer, Farms, we are of the opinion that the petitioners have not established that they were either required to live upon the premises as a condition *94 of their employment, or that the housing in question was furnished for the convenience of the employer. An examination of petitioner's duties reveals that, notwithstanding his constant attention to the various aspects of the business of Peterson Farms, Inc., he was not required to be present at all times of the day and night. Rather, his responsibilities were of a supervisory nature and could be properly performed without living on the business premises of the employer. The instant cases are unlike either that of William I. Olkjer, supra, or Arturh Benaglia, supra. In Olkjer the taxpayer employee was working in an area where the only living facilities available were at the jobsite. If the housing and meals were not provided by the employer, no work could have been accomplished by the employee. In the Benaglia case the taxpayer was a manager in full charge of several hotels. We found that "[his] duty was continuous and required his presence at a moment's call." See Arthur Benaglia, supra, at 839. In the instant cases we are not persuaded by the record before us that petitioners have successfully borne their burden of proving that the meals *95 and lodging furnished to the Petersons by Farms were "for the convenience of the employer" or that Lloyd E. Peterson was "required to accept such lodging on the business premises of his employer as a condition of his employment." The Petersons maintained a home in the town of Decatur prior to 1957. There is no evidence with regard to the distance between this home and the business premises of Farms and its predecessor corporation or with regard to any inconvenience suffered by his employer by reason of the Petersons' residence in Decatur. There is no evidence as to any material change in the character of the business of Farms in 1957 and subsequent years, and no evidence that a suitable residence could not be found in Decatur. In 1955 the Petersons themselves first formed the intention of constructing a residence on their property adjacent to the business premises of their wholly owned corporation. Construction of the residence was practically completed before any corporate resolution was adopted which purported to require Peterson to accept lodging on the business premises of Farms as a condition to his employment as president. At that time he owned all but two shares of the stock *96 of Farms and his wife and mother owned those two shares. On the record before us we are unable to accept "the bona fides of the employer's demand" that Peterson occupy lodging on Farms' premises as a condition of his employment as president. See Mary B. Heyward, supra at 744. We therefore conclude that neither Lloyd nor Lorrayne Peterson lived in the house for the convenience of the employer nor as a condition of employment within the meaning of section 119. Although the house was partially used on frequent occasions for entertainment of customers, this fact did not require that the Petersons reside in it. Mary B. Heyward, supra at 745; Dean v. Commissioner, 187 F. 2d 1019, affirming a Memorandum Opinion of this Court; Chandler v. Commissioner, 119 F. 2d 623, affirming 41 B.T.A. 165. Whether adequate facilities for the entertainment of clients existed in the area is not a factor in considering the question of the necessity for the Petersons to occupy the house. We conclude that the fair market value of the meals and lodging is includable in the gross income of the Petersons for the years 1958, 1959, and 1960. *97 Our Findings contain the schedule in which respondent has determined the additional amounts to be included in the Petersons' gross income for the years in question. Respondent's determination with regard to the fair market value of the rent for such a house indicates that he believes that the rental value was approximately $817.86 per month for 1958, $867'.7 per month for 1959, and $873.82 per month for 1960. Petitioner argue that the fair rental value of the house did not exceed $300 per month. The record contains the testimony of only one expert witness on this subject, a real estate man in the area. He testified that there was little rental activity in Decatur and its environs. His only knowledge with regard to rentals in the vicinity of Decatur concerned a house worth $28,000 which was rented for $125 per month. Upon the record before us and using our best judgment, we have concluded that the fair market rental value of the house was not less than $400 per month. Respondent has also included in the Petersons' gross income other cash expenses made by the corporation relating to the upkeep of the house. These expenses consist of repairs, maintenance, household supplies, special *98 food for guests, and utilities, etc. Respondent has allowed a portion of the expenses for each year as pertaining to the operation of the house as a business guest house and has included only the balance in the gross income of the Petersons. Petitioners have failed to prove that respondent's allowances did not fairly approximate the ordinary and necessary expenses of the house which related to the conduct of the business of Peterson Farms, Inc. Therefore, we decline to disapprove his determinations with regard to this issue. Peterson contends that, because the amount of $790.34 was mistakenly paid to him in 1959 by Farms, respondent erred in including this amount in his income for 1959. Petitioner urges that he has "acknowledged the debt and is not holding the amount under any claim of right," and therefore the amount is not income to him in 1959. As authority for this proposition he cites the District Court opinion in Ansco Photo Products v. Clark, 34 F. 2d 568. Respondent contends that this issue is not properly before us because petitioner's position on this question was not specifically pleaded in the petition. We do not agree. The item was included in respondent's *99 computations accompanying his notice of deficiency, and petitioner alleged in his petition that he "did not receive any dividends from Peterson Farms, Inc." With respect to the merits, respondent argues that the facts do not support a finding that such a liability from Peterson to Farms exists. Therefore, he concludes that the rule enunciated by the Supreme Court in United States v. Lewis, 340 U.S. 590, should apply making the $790.34 payment taxable to Peterson in the year of its receipt. We agree with respondent that the record does not contain any evidence tending to establish the existence of a debt from Peterson to Farms during the taxable years. It appears to us that notwithstanding petitioner's acknowledgment of a debt at the time of trial, no payment of which is shown by the record, he held these funds prior to that occasion under a claim of right without any restrictions as to their disposition. His later recognition of a superior right in the corporation to these funds does not afford him any relief from respondent's determination that this payment represented taxable income to him in the year of its receipt, 1959. United States v. Lewis, supra; *100 Estate of Samuel Stein, 37 T.C. 945, 957. Petitioner's reliance upon the Ansco Photo Products case is misplaced. There the taxpayer established that he was a conduit who received funds from one party and was under an obligation to deliver them to another party. In the instant cases no such distinguishing fact is present. The issues with respect to the deficiencies determined against Peterson Farms, Inc., concern whether the expenses which Farms incurred for the maintenance of the guest house constitute "ordinary and necessary expenses" deductible under section 162(a) of the 1954 Code. Also at issue is whether certain amounts relating to depreciation of equipment and all of the depreciation of the guest house constituted reasonable allowances for the exhaustion of property used in trade or business under section 167. Petitioner argues that the purpose and use of the house clearly indicate that depreciation is allowable under section 167 and that the expenses in connection with the house are properly deductible under section 162(a). He further contends that if we conclude that the value of the meals and lodging furnished the Petersons is includable in their gross income *101 (as we have so done), then we should characterize this additional income as compensation to the Petersons rather than as a dividend. Respondent urges that most of the expenses incident to the operation of the guest house and the depreciation thereof are not allowable because the principal use of the residence was as a home for the Petersons. He maintains that Farms has been allowed deduction of part of the amount claimed for business entertainment done by the Petersons on behalf of Farms, and that petitioner has not established that this allowance was erroneous. Respondent argues that the value of the lodging and the expenses pertaining to the house, which we have included in the Petersons' gross income for the years 1958 through 1960, constitute a taxable dividend to Peterson, a dominant stockholder in Farms. The problem of what constitutes an ordinary and necessary business expense within the meaning of section 162(a) [3] has long been a difficult question which must be decided according to the peculiar facts which each case presents. See, e.g., Welch v. Helvering, 290 U.S. 111. *102 We recognize that a certain amount of bona fide business entertaining was done by the Petersons in the house during the years in question. However, petitioners have not proved that the amounts allowed to Farms as deductions on this account were not adequate to defray the cost of such business entertainment. We have also not neglected the fact that some bona fide business entertainment of nonovernight guests took place during the years 1958 through 1960. In estimating the cost of the expenses incurred by Farms for business entertainment of the overnight and nonovernight guest type, we have employed the approximation method as prescribed in Cohan v. Commissioner, 39 F. 2d 540, since the rule of this case still applies to the years before us. [4]
After consideration of the needs of the corporation Farms for adequate facilities to entertain customers and provide them with overnight lodging, and the use and allocation of certain space in the residence *103 in question for that purpose, we have concluded that 25 percent of the depreciation claimed by Farms on the house and furnishings therein is allowable as a reasonable allowance for the exhaustion of property used in trade or business under section 167(a)(1) of the 1954 Code. We have again relied upon the rule of Cohan v. Commissioner, supra, in order to reach this result. See also Walter M. Joyce, 25 T.C. 13, 15, 16; cf. Louis Greenspon, 23 T.C. 138, 151, affd. on this issue, 229 F. 2d 947. Respondent also adjusted the depreciation allowances relating to certain other farm buildings and equipment. Since petitioner has not presented any evidence with regard to this issue, respondent's determinations are approved. We turn now to the question of whether the additions to the Petersons' gross income, as we have found them, should be regarded as compensation or dividends to them from Farms. Respondent determined in his notice of deficiency to Lloyd E. and Lorrayne Peterson that the additional amounts includable in their income were dividends from Farms. This determination is presumptively correct and petitioners not the character of *104 this additional income. We do not believe that petitioners have met this burden. There was no evidence adduced relating to the value of Lloyd Peterson's services in the chicken breeding industry nor was there any indication in the record that the corporation Farms intended that the providing of the house to Peterson was to be additional compensation for his services. See Challenge Manufacturing Co., 37 T.C. 650, 663. Hence, we conclude that the additions to the Petersons' gross income were not additional compensation which would be deductible by Farms, but rather were in the nature of dividends to the extent of existing earnings and profits which can be computed under Rule 50 according to the definition contained in section 316(a) of the 1954 Code. To the extent that there were no existing earnings and profits, such distributions would be returns of capital. Decisions will be entered under Rule 50. Footnotes
1. These cases were heard by Judge Morton P. Fisher and briefs were duly filed. Judge Fisher died on February 11, 1965. These cases, not having been disposed of, were reassigned to Judge John W. Kern on March 2, 1965, and notice was given to the parties that any request for rehearing or reargument might be presented to him within 30 days. No such requests have been received.↩
2. SEC. 119. MEALS OR LODGING FURNISHED FOR THE CONVENIENCE OF THE EMPLOYER. There shall be excluded from gross income of an employee the value of any meals or lodging furnished to him by his employer for the convenience of the employer, but only if - (1) in the case of meals, the meals are furnished on the business premises of the employer, or (2) in the case of lodging, the employee is required to accept such lodging on the business premises of his employer as a condition of his employment. In determining whether meals or lodging are furnished for the convenience of the employer, the provisions of an employment contract or of a State statute fixing terms of employment shall not be determinative of whether the meals or lodging are intended as compensation.↩
3. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; (2) traveling expenses (including the entire amount expended for meals and lodging) while away from home in the pursuit of a trade or business; and (3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity. * * *↩
4. Section 274 added to the Internal Revenue Code of 1954 by section 4 of the Revenue Act of 1962 is applicable only to taxable years ended after December 31, 1962, but only with respect to periods after such date.↩