Booth, Judge,
delivered the opinion of the court:
The plaintiff is a major in the Army. From January 1, 1923, until August 25, 1923, he was stationed at Fortress Monroe, Va. During this period he was assigned and occupied Government quarters in accord with his rank. On August 25, 1923, he was detached from duty at Fortress Monroe and detailed for duty in Washington, D. C. While in Washington, from August 25,1923, to December 31, 1923, there being no Government quarters available for his occupancy, he was paid and received $500 in cash as commutation of quarters. The plaintiff in making out his income-tax return for 1923 included, under protest, as an item of his *563 gross income, the rental value of the quarters occupied by him at Fortress Monroe and the $500 in cash received as commutation of quarters in Washington, Prior to filing his income-tax return the plaintiff had consulted with the Commissioner of Internal Revt nue with respect to the inclusion of the two items, and the commissioner ruled that they were income and must be returned as such, fixing the alleged fair rental value of the quarters occupied at $940. The total income tax due by reason of the inclusion of said sum of $1,440 was $21.89. This amount the plaintiff paid under protest, and ther; after filed in due form a claim for refund of the tax, which the commissioner disallowed. This suit is to recover the tax so paid.
Section 213 of the revenue act of 1921 (42 Stat. 237) enumerates with precision the various modes of accumulation which constitute under the statute gross income. So far as pertinent to the present discussion it may be abbreviatively reproduced as follows:
“That for tin purposes of this title * * * the term cgross income’ (a) includes gains, profits, and income derived from salaries, wages, or compensation for personal service (including in the case of the President of the United States, the judges of the Supreme and Inferior Courts of the United States, and all other officers and employees, whether elected or appointed, of the United States, Alaska, Hawaii, or any political subdivision thereof, or the District of Columbia, the compensation received as such) of whatever kind and in whatever form paid * *
■ It is to be observed that the parenthetical clause of the foregoing section of the revenue law is susceptible to a construction that Congress intended to impose upon the Government officers mentioned an income tax on their “ compensation received as such.” Whether we assume, the words “ as such” intentionally modify compensation or officer, it is certain that they serve a purpose and were intended to make a distinction in dealing with the officers mentioned; otherwise they would not have been used. Jones v. Parker, 67 Tex. 76, 81.
The revenue acts prior to 1918 excluded from income taxation the compensation received by the President, Federal judges, and officers and employees of a State, except *564 as to the latter such as might be paid to them by the Federal Government. The revenue acts of 1918 and 1921, 40 Stat. 1065, 42 Stat. 227, 238, taxed the compensation received by the President and the Federal judges, employing in the taxing acts the identical language involved herein. Having excluded in the first revenue laws the compensation of the President and the Federal judges from income taxation, unqu stionabty because of its doubtful constitutionality, Congress concluded in 1918 and following years to raise the question. The debates in Congress so indicate. The issue was finally presented to the' Supreme Court in Evans v. Gore, 253 U. S. 245, and the tax imposed upon the Federal judiciary was declared to be unconstitutional. The Revenue Bureau, however, has consist, ntly and persistently ruled that Federal judges are not subject to a new or increased tax if appointed prior to the passage of such a taxing statute, and since the act of 1921 in no wise increased the tax, all judges appointed since February 24, 1919, are subject to an income tax upon their salary. The same ruling has be n made as to the Presidency. The incumbent of that office, elected after the passage of the act of 1918, has been taxed. Therefore, it seems quite clear that ,the purpose and intent of Congress in inserting the parenthetical clause in the act of 1918 and continuing the exact language in subsequent legislation was to tax the compensation received by the President and Federal judges in their official capacity. In other words, to subject them to an imposition of the tax as such officers, whereas they had theretofore been excluded. As to the officers and employees of the United States, its island possessions and the District of Columbia, the reason for specific reference to them is not so clear. Just why they were joined in the clause is not apparent. In any event, their inclusion does not change the inference that what Congress intended and designedly expressed was to reach the compensation received by all such officers. So that so far as the construction of the taxing statute is involved, the real issue as to this aspect of the case is whether th' allowance known as commutation of quarters, or assignment and occupancy of quarters granted an Army officer, is compensation.
*565 What is or is not compensation is not always easy to determine in cases where one receives an annual salary and by reason of the duties of his office is entitled to privileges and advantages sometimes discharged in money and at other times in kind. It is not new for this court to be confronted with the question. Under the long-established system of ’pay and allowances for officers of the Army and Navy, we have had occasion in numerous cases, involving almost every aspect of the controversy, to determine the scope and effect of statutes upon the subject. At the outset it may be stated with unquestionable accuracy that the War Department, Congress, and the courts have recognized a distinction between pay and allowances. Inherently such a distinction exists. As illustrative of the fact, the act of February 14, 1885, 23 Stat. 305, provided that enlisted men and noncom-missioned officers when retired should receive “seventy-five per centum of the pay and allowances of the rank upon which he was retired.” [Italics ours.] The act of May 26, 1900 (31 Stat. 205, 211), used the words “pay proper” in providing as follows:
“Provided-, That hereafter the pay proper of all officers and enlisted men serving in Porto Kico, Cuba, the Philippine Islands, Hawaii, and in the Territory of Alaska, «ball be increased ten per centum for officers and twenty per centum for enlisted men over and above the rates of pay proper as fixed by law in time of peace.”
The act of March 2, 1901, 31 Stat. 895, 903, enlarged the preceding law by providing as follows:
“Provided, That hereafter the pay proper of all officers and enlisted men serving beyond the limits of the States comprising the Union, and the Territories of the United States contiguous thereto, shall be increased ten per centum for officers and twenty per centum for enlisted men over and above the rates of pay proper as fixed by law for time of peace.”
More recently, section 12 of the act of September 7, 1916, 39 Stat. 746, legislation providing compensation for Government employees injured while in the performance of their duties, pointed out a method of computing pay, providing “ that in computing the monthly pay * * * sub *566 sistence and the value of quarters furnished an employee shall be included as part of the pay.” Again, the act of October 6, 1917, 40 Stat. 402, amending the original act establishing the Bureau of War Bisk Insurance in the Treasury Department, expressly defined the term pay as “pay for service in the United States according to grade and length of service, excluding all allowances.”
The first income tax act, passed in 1862, 12 Stat. 472, by express terms provided that “ there shall be levied, collected, and paid on all salaries of officers, or payments to persons in the civil, military, naval, or other employment or service of the United States,” thereby expressly imposing a tax, not only upon the salaries of officers, but likewise upon “payments” to persons in the civil or military service of the Government, thus expressly recognizing the long-established distinction between compensation and allowances, and this language was repeated by Congress in the income tax law of 1894, 28 Stat. 509. As a matter of fact, legislation of this character is so pointedly illustrative of a recognized and long-established difference between compensation and allowances provided for under certain prescribed conditions, that multiplication of citations would serve no useful purpose.
Mr. Justice Brown, in United States v. Smith, 158 U. S. 346, clearly distinguished between allowances which form a part of compensation and those which serve to reimburse for expenditures made. In Sherburne's case, 16 C. Cls. 491, this court, quoting from Scott’s Military Dictionary, said:
“Pay is a fixed and direct amount given by law to persons in the military service in consideration of and as compensation for their personal service. Allowances, as they are called, or emoluments, as they were formerly termed, are indirect or contingent remuneration which may or may not be earned, and which is sometimes in the nature of compensation and sometimes in the nature of reimbursement.”
In United States v. Mills, 197 U. S. 223-227, the Supreme Court had before it the question of computation of longevity pay due an officer of the Army. In the course of the discussion this language was used: “ The words ‘ pay proper,’ we see no reason to think, are to be construed differently from the word ‘ pay.’ The term means compensation, which may *567 properly be described or designated as ‘pay,’ as distinguished from allowances, commutation for rations, or other methods of compensation not specifically described as pay.” In our view of the case, what was said in the Mills case is a clear exposition of the fundamental distinction between “ pay ” and “ allowances.” Therein it is pointed out with clearness the line of demarcation between pay proper, allowances, and other methods of compensation, the court emphasizing by specification and generalization what Congress intended by use of descriptive terms in characterizing “ pay proper.”
Federal District and Circuit judges receive an allowance of not to exceed ten dollars a day when absent holding court away from their homes. Allowances of this character are clearly intended as reimbursements and form no part of the judges’ compensation. Smith v. Jackson, 241 Fed. 747, 246 U. S. 388; Payne v. Reeves, 184 N. W. (S. D.) 993; Christopherson v. Reeves, id. 1015; State v. Weedon, 221 S. W. (Tenn.) 941; Macon Co. v. Williams, 224 S. W. (Mo.) 835; McCoy v. Handlin, 153 N. W. (S. D.) 361.
Congress annually appropriates certain sums for the executive department and likewise a travel allowance. Such appropriations have not been and are not charged against the President as compensation. Members of Congress receive certain allowances. This court determined with refer-erence to mileage that the allowance was no part of their compensation. Wilson v. United States, 44 C. Cls. 428. A vast number of Government employees receive traveling expenses and fixed sums in lieu of subsistence when away on Government affairs. Clearly such allowances are for purposes of reimbursement. Each member of the Cabinet is furnished means of transportation at Government expense. The Vice President is allowed a sum sufficient to procure and maintain an automobile. It is not even suggested that allowances of this character are compensation. In what respect, then, is the allowance of public quarters or commutation of quarters to an Army officer different in character from one intended as reimbursement? We are quite firmly convinced that not only are they not allowances of a compensatory character, but they are not income as well. *568 It is common knowledge that the President of the United States receives as compensation $75,000 per annum. The compensation of Federal judges is their fixed annual salary. Generally, and almost without exception, including the Army and Navy, the Federal statutes fix a certain specified pay for each employee or officer of the Government, known as his compensation. This is a fixed and definite sum annually appropriated for and to which the occupant of the office is by law fully entitled so long as he remains in office, and entitled to whether sick or well, unless separated from the office, and it is this sum, this annual salary, to which Congress and all others refer when they speak of the officer’s compensation, and manifestly, unless there is some qualification of the term, some legislative expression that Congress intended to reach out and tax what has continuously, and notoriously been regarded as an allowance, distinct from compensation, the just inference is an intent to limit the gross income of the officers mentioned-to their pay proper, their fixed compensation. We have said that we do not believe the allowance of quarters or commutation thereof to an officer of the Army is income.
As long as we have had an Army, officers of the Army have not only been permitted but compelled to occupy public quarters when the same were available. This practice, custom, and requirement has prevailed for so long a time, both in this country and abroad, that it would be difficult to establish the date of its origin. The very first Army Regulations issued in the United States, after the organization of the Army, made provision for this identical thing, and without interruption as to essential features it has continued from that day to this. No question as to the discontinuance of the requirement has ever been the subject of agitation, and Congress without hesitation has made and continues to make available each year a sum of money sufficient to pay commutation of quarters and provide public quarters for officers and enlisted men of the Army as well. In the earlier periods of our history the allowance of quarters was provided for in Army Regulations. Officers were assigned a fixed number of rooms according to their rank; and if public quarters were not available at the post, fort, or station, suit *569 able quarters were' rented or, as the regulations stated, “ hired ” by the Quartermaster’s Department and the expense incurred paid out of the general appropriation for the Army. Subsequently it developed that not infrequently there was no one in authority at the post or station to hire quarters when the same were not available, and to obviate this difficulty the regulations authorized the officer himself to procure quarters and receive in return “ a reasonable commutation in money.” Without going further into detail, it is sufficient to observe that Congress has uninterruptedly recognized the right of officers to public quarters when available at his post or station and, when not so available, his right to commutation of quarters in money. Varying changes have from time to time been adopted as to the conditions under which the allowances should be made, but the substantial right itself has continued unimpaired. A complete and sequential history of the law and regulations made in pursuance thereof is set forth in the stipulated findings of fact and need not be repeated here.
The origin and continuance of the Army custom, as well as the law of the Army itself, indicate beyond a doubt that public quarters for the housing of enlisted men and officers is as much a military necessity as the procurement of implements of warfare or the training of troops. Congress has appropriated vast sums of money to establish permanent military posts and stations throughout the country, and in not one but all Army appropriations provision is of course made for the erection of barracks, officers’ quarters, and every other necessary building to maintain, house, and properly care for the enlisted men and officers of the post or station. We need not assert that an officer’s duties require his physical presence at his post or station; his service is continuous day and night; his movements are governed by orders and commands, by military law; troops are to be trained, discipline is to be enforced, and more than one exigency of the military service requires the officer to live with his command. In addition to what has been said, many officers may be and are required to keep and render a variety of official reports, perform certain prescribed military duties during both day and night. All these and many more con *570 siderations, of which we confess an unfamiliarity, make it imperative upon the part of the Government to provide housing facilities for troops and officers of the Army if an army is to be maintained at all. Therefore it seems to us that military quarters for both the enlisted men and officers of the Army are no more than an integral part of the organization itself. They are, so to speak, units of the military plant, the indispensable facilities for keeping the Army intact and maintaining it as such, as much so as the crude shelter provided for a watchman at a railroad station, or the lonely habitation of a lighthouse keeper. The officer is not paid a salary and furnished a house to live in for his services ; he is, on the contrary, paid a salary to live in the quarters furnished.
But we are told that if the Government did not furnish the officer quarters he would have to incur the expense of procuring the same. Such an argument is absolutely devoid of merit. The inherent organization of the Military Establishment of the United States refutes it. Imagine a military post uninhabited by officers. Speculation as to possibilities and conditions in the face of long recognized and firmly established status and organization of the' Army are indeed idle. An Army officer’s rights and privileges.under the law are not to be gauged by comparisons. The Supreme Court said, in United States v. Phisterer, 94 U. S. 224:
“ Quarters are expected to be furnished by the Government to its officers; when it can not thus furnish, it allows them to be obtained otherwise and pays a monetary compensation therefor called commutation. This upon the assumption, first, that the officers are actually engaged in the public service; and, second, that such quarters are necessary to the discharge of their duty.”
The policy of Congress has been and is to assimilate the pay of officers of the Army and Navy. Congress has consistently endeavored to equalize the pay of officers of the Army in keeping with'their rank and duties. (Sec. 13 of the Navy personnel act, 30 Stat. 1007, and succeeding legislation down to and including the act of June 10, 1922, 42 Stat. 625.) The last-named statute readjusts the pay of the Army, Navy, Marine Corps, Coast Guard, Coast and Geo- *571 detie Survey, and Public Health Service. The pay proper and method of its computation is set forth in detail. Section 6 of the statute, the section involved here, provides for commutation of quarters and assignment of available quarters. Under the provisions of this section the money value of commutation of quarters is to be fixed each year by the President after an investigation and certification by the Secretary of Labor as to the comparative costs of rents' in the United States, and in no event to exceed $20 per month per room. The Revenue Bureau, in assessing income tax upon the officer’s salary, arbitrarily adopts the commutation value of the occupied public quarters. If, therefore, quarters, or commutation of same, is compensation, then the obvious effect of the statute is to allow the President, in part at least, to fix the compensation of Army officers, and Congress has dejegated to him that power. Without questioning the power, with which we are not concerned, we assuredly doubt the intent. Again, the same section of the statute makes an emphatic distinction between the officer with dependents and the one without. A decided curtailment of the allowance obtains as to the officer without dependents, a manifest legislative recognition of the divergence in personal expense as to the two situations. If, however, the allowance is compensatory, the purpose of the statute is thwarted, for the officer without dependents is required to pay less from his pay proper in income taxes than the officer with dependents, and if both occupy quarters in kind, the officer with dependents will obviously save less of his base pay than the officer without. In common parlance, compensation, when used in connection with salaried officials, is the equivalent of money paid for services performed and received as such. While, of course, it may have a broader legal significance, it is not the rule of statutory construction to give the word more than its ordinary meaning unless from the four corners of the statute such was the legislative intent. In the case of Gould v. Gould, 245 U. S. 151, the Supreme Court said: “ In the interpretation of statutes levying taxes it is the established rule not to extend their provisions by implication beyond the clear import of the language used or to enlarge their operation *572 as to embrace matters not specifically pointed out. In case of doubt, they are construed most strong-ly against the Government and in favor of the citizen.” See also United States v. Merriam, 263 U. S. 179.
The defendant, in its brief, apparently predicates its argument upon the money received by the officer as commutation of quarters. Money, it is said, is the clearest form of income, and when the officer is allowed to receive and expend it free from Government control it is obviously compensation and income. In order to sustain the contention the defendant is put to the necessity of overruling certain decisions of the Supreme and this court. This is done by an ingenious analysis of the acts of 1922 and 1924. This court held in Jaegle v. United States, 28 C. Cls. 133, in an opinion by the late Chief Justice Nott, that—
“ Commutation in the military service is money paid in substitution of something to which an officer, sailor, or soldier is entitled by law or regulations or general orders of the commander in chief. The fact that the statute and the regulations of the Army and Navy prescribe the cases in which commutation may be allowed excludes the supposition of its being allowed by inferior authority. Commutation is not necessarily equal to the value of the thing for which it is a substitute, but is supposed to be, in the general average of cases, a fair equivalent.”
In Odell v. United States, 38 C. Cls. 194, 198, Judge Weldon said:
“ Reimbursement is primarily what the law contemplates; but when there is no expense, as in this case (the occupied quarters being a part of the Naval Establishment of the United States), there can be no reimbursement in fact, and therefore none allowed by law. If the claimant had occupied quarters not belonging to the United States and was otherwise entitled under the circumstances to quarters, the fact that he was not charged with the use of quarters would not be material and would not affect the right and obligation of the parties; but when, as in this case, the quarters occupied belonged to the defendant there is no legal right of recovery.” See also United States v. Mills, supra; United States v. Smith, supra; United States v. Phisterer, supra.
But, says the defendant, the acts of 1922 and 1924 revolutionized the subject of commutation of quarters. Congress, *573 by this legislation, made commutation the primary, and quarters in kind the secondary, right of the officer. We confess some difficulty in apprehending the force of the contention. If it is meant to assert that an officer may choose between an acceptance of commutation or quarters in kind, the error is obvious. The officer has no such choice. As a matter of fact, the legislation referred to in no way reverses the fundamental principle originally provided for in Army regulations and subsequently adopted by Congress, that treated as due an officer of the Army proper quarters in which to live with his dependents in order to discharge his military duties. The statutes regulate the subject matter, prescribe the quantum of allowances, and alter the methods, making, it is true, some radical changes as to when and when not the allowances obtain. In no single provision, however, in either the law or regulations, are we able to discover the slightest deviation from the long established and firmly adhered to principle that in no case may an officer receive commutation of quarters save he is denied the right and privilege accorded him by the acts of public quarters. It is true an officer may be assigned one room and a bath and receive commutation for the remainder of the number of rooms authorized for his grade. Surely that in no wise fortifies the defendant’s contention. The regulation but meets a contingency of inadequate availability of quarters and preserves the right fro tanto. The regulations provide that when adequate quarters are available they must be assigned, a mandatory provision, and if inadequate and only partially available for the convenience of the Government, the officer may occupy one, and only one room and a bath, but bearing in mind that this is only in the instance of inadequacy, for an officer is not required to occupy inadequate Quarters. Is it to be said in any event that this single contingent provision is so revolutionary in character as to annihilate a time-honored policy? Are the few inconsequential exceptions to the general intent of the law to overthrow the obvious purpose to be accomplished in its enactment? We think not. Congress, during the war, made generous provisions for officers who were at the front on foreign soil.
*574 The act of April 16, 1918, 40 Stat. 530, extended by the act of May 18, 1920, 41 Stat. 602, until June 30, 1922, expressly granted to an officer in the field -what was under the law and regulations then denied him, the right to quarters or commutation of quarters for his dependents. Is it to be asserted that this exceptional allowance constitutes added compensation? Certainly not. It is not different in form or substance in any respect from the original purpose of the allowances themselves. In our view of this question, we entertain no doubt that the assignment of public quarters to an Army officer is the equivalent of placing the official in that part of the Army plant where he is to discharge his duties; that it is not for the officer’s benefit, but for the Government’s and that the principle of commutation of quarters was conceived as reimbursement, and continues as reimbursement.
Lastly, may such allowances be considered as income? In Eisner v. Macomber (252 U. S. 189), we find this expression: “Income may be defined as the gain derived from capital, from labor, or from both combined.” The defendant criticises the citation of the above case on the grounds of utter dissimilarity as to issue. There can be no doubt that as to issues involved the citation is inapposite. Nevertheless, the generalization of the definition is possible. In this case involving personal service it is comprehensive. The essential factor in the determination of the question lies not alone in the single element of gain, but gain derived from labor. In other words, as remuneration for the officer’s services is he not only paid a salary but in addition furnished a house to live in as part thereof? If so, income accrues; if not, no income accrues. The most conspicuous illustration of the differentiation is the Chief Executive of the Nation. Our Presidents occupy the White House. If in computing income tax the fair rental value of this most historic and pretentious house and grounds is to be the standard, the annual compensation of the President would indeed be substantially reduced. In the scheme of Government, just as in the Army, the White House becomes the Executive office of the Nation. It is an inseparable incident of the office itself, the one provision made by Congress *575 wbereiñ the Executive’s duties are to be discharged. An English case decided by the House of Lords in 1892 (Tennant v. Smith, H. L. 1892 Appeal Cases, 150) points out with distinct clearness the vital difference between income and that which is not income, though apparently an advantage. Lord Watson said:
“ It appears to me that the case was decided in the court beloAv, as it has been argued at your Lordship’s bar, upon the true legal issue — namely, whether the appellant’s residence is income within the meaning of the statutes which must be valued and assessed for income taxes. * * * The appellant does no doubt reside in the building, but he does so as the servant of the bank and for the purpose of performing the duty which he owes his employers. His position does not differ in any respect from that of a caretaker or other servant, the nature of whose employment requires that he shall live in his master’s dwelling house or business premises instead of occupying a separate residence of his own * * *. In the present case the learned judges of the majority have assessed the value of the appellant’s residence at £50 upon the somewhat speculative footing that if his duty did not require him to reside in the bank he would be compelled to pay that sum for suitable accommodation for himself and family elsewhere. In that view the so-called benefit may in some instances prove a heavy burden as in the case of a bank agent who, but for the service required by his employers, could continue to reside, free of charge, in his parents’ house.”
Again, Judge Clayton, in Smith v. Jackson, 241 Fed. 747, said:
“I think it may be said, therefore, that an emolument is something positively and directly conferred, as compensation or gain, that the holder of an office receives, and not something necessarily, inseparably, and incidentally used by him in the discharge of his duty, a duty for which he is paid a fixed salary.”
We have heretofore cited a number of State cases. The line of demarcation runs parallel with the services one engages to perform. If the nature of the services require the furnishing of a house for their proper performance, and without it the service may not properly be rendered, the house so furnished is part of the maintenance of the general enterprise, an overhead expense, so to speak, and forms no part of the individual income of the laborer. The master *576 of a vessel and captain of a steamboat are furnished living quarters while on a voyage. A countless number of employees engaged in a great variety of special and important employment are required to be continuously present on the job. They must not only have a place in which to live but adequate facilities for doing what they are called upon to do. Is the maintenance of this overhead expense to be first charged to the Government and then in part recouped from the officer’s salary by way of taxation ?
In the'determination of the issue we keep constantly to the fore the pertinent fact that we are dealing with a governmental institution, an organization whose internal affairs are regulated by military law and regulations, and that whatever gain accrues to the officer by reason of these particular allowances must be a gain derived from the particular services he renders for which remuneration is paid, and which the laws of the organization exact as quid fro quo. It is conceded that an officer, as part of his military duty, must reside at his post or station. No one would have the courage to assert that such was not the fact. Indeed, it is a primary necessity, the one thing within the intent and purpose of the law, both civil and military. If quarters are available the officer must live there. He has no choice. The extent, of quarters assigned him, the number of rooms essential for his needs, is fixed not by the officer, but by law. No matter how inconvenient, if adequate he must occupy them or lose the allowance and obtain permission otherwise. Nor does he have the choice of domicile. He may be in the East to-day and in the West tomorrow. When the nature of his duties does not require his personal presence the allowance does not follow. More than sixty-five per cent of the Army officers occupy public quarters.
There are additional instances in the regulations where the allowance is lost, and lost because not indispensable for the performance of the service required. While the mere character of the contingency may not irrevocably determine the nature of the allowance, it is a prime factor available as such in reaching a conclusion as to whether it is a gain derived from service. The officer may not rent the premises assigned and live away from them. He has no control *577 thereover, except the naked right of an uncertain period of occupancy. The advantage which accrues, the gain which obtains, if any such obtains, is to be ascertained by comparison only, and the comparison resorted to is one involving the mode of living in civil life with that which obtains in the Army. Aside from the pronounced dissimilarity of the two, the argument predicated thereon affords no solution of the problem, for the conclusion drawn results only in a saving, which of itself is not income. It is said that if the officer was not permitted to occupy public quarters he would be compelled to hire them and pay the expense from his salary. The Department of Justice in Washington occupies and conducts the major portion of its affairs from a ■commodious and modern office building, rented from the owner and the rent paid by the Government. If the learned Assistant Attorney should resign his public office and resume private practice he would manifestly be required to rent an office and pay from his own income the expense thereof. Does this fact indubitably characterize the privilege of occupancy of an office in the department, rent free, .as income? We think not, for both he and an officer of the Army must remain in the quarters assigned them as an inseparable part of their prescribed duties, just as much so as is the conducting of a trial or the giving of military instructions or the training of troops. The public quarters of the officer is his office as well as his temporary home. It is not, as well said in the case of Tennant v. Smith, supra, what is paid out but what comes in that constitutes income. It is indeed far from impressive that where an employer, in the course of the promotion and efficiency of the enterprise in which he is engaged, must of necessity provide the indispensable facilities for the successful prosecution of the same, because perchance an employee in the not to be •avoided course of his duties may be in a position to avoid an expense which in a different chara'cter of service he might be obliged to incur, that therefore the use of the facility constitutes income. In any event, the contention is without merit. Situations must be faced as they exist; rights are not to be determined upon a hypothetical basis *578 in the face of facts. The Army officer may not provide himself with his own quarters. No such regulation or law has ever prevailed. Congress has never accorded the privilege, and the provision for commutation emphasizes the fact. On the contrary, the Government furnishes the quarters as a part of the military establishment itself.
From what has been said we believe the plaintiff is entitled to judgment for the amount claimed. It is so ordered.
GRAham, Judge; Hay, Judge; DowNey, Judge; and Campbell, Chief Justice, concur.