LYNDA LEE WEAVER ET AL. *v.* PRINCE GEORGE'S COUNTY, MARYLAND

[No. 2, September Term, 1977.]

*Decided November 3, 1977.*

350

The cause was argued before MURPHY, C. J., and ▌SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ.

*Louis Pohoryles*, with whom were *Pohoryles, Goldberg, Repetti & Harris* on the brief, and *Thomas P. Smith*, with whom were *Burt M. Kahn* and *Kaplan, Smith, Joseph, Greenwald & Laake* on the brief, for appellants.

*James C. Chapin, County Attorney*, and *Steven M. Gilbert, Associate County Attorney*, with whom was *Richard S. Alper, Associate County Attorney*, on the brief, for appellee.

LEVINE, J., delivered the opinion of the Court.

In this appeal, we are called upon to determine whether the Prince George's County Multifamily Occupancy Tax (the Occupancy Tax) is a property tax subject to the uniformity requirements of Article 15 of the Maryland Declaration of Rights and whether the County acted *ultra vires* the State enabling Act (the State Act) in denying recipients of military housing allowances the benefit of the State Act's exemption for families receiving a "housing subsidy." [1]

---

[1] To date only one other jurisdiction in the United States has adopted a residential tenants' tax similar to the one enacted by Prince George's County—Arizona: *Ariz. Rev. Stat.* § 42-1701 *et seq.* (West Supp. 1976). A renters' tax was introduced in the New York legislature, but apparently has not been enacted. That bill is set out in full in Kee & Moan, *The Property Tax and Tenant Equality*, 89 Harv. L. Rev. 531, 548 *et seq.* (1976). For another proposed model tenants' tax designed to give tenants the benefit of a real property tax deduction under I.R.C. § 164, see Freeman, *The Tenant Tax Act: Extending the Federal Real Estate Tax Deduction to Residential Tenants*, 13 Harv. J. Legis. 298 (1976).

Appellants, who are tenants, landlords and rental management companies in Prince George's County, commenced this declaratory judgment proceeding in the Circuit Court for Prince George's County. There, the chancellor (Bowling, J.) upheld the constitutionality of the Occupancy Tax on the grounds that the plaintiffs were foreclosed from raising the issue by the doctrine of collateral estoppel.[2] The circuit court, however, did rule that by applying the tax to persons receiving military housing allowances, the County had exceeded its authority under the State Act. All parties appealed to the Court of Special Appeals, which, in *Weaver v. Prince George's County*, 34 Md. App. 189, 205, 366 A. 2d 1048 (1976), reversed the chancellor's ruling with respect to the military housing allowances. Holding also that appellants' constitutional claims were not barred by the doctrine of collateral estoppel, the Court of Special Appeals considered each of the constitutional challenges and held ultimately that both the State Act and the implementing County ordinance were constitutional in all respects. We then granted certiorari, and for reasons that follow, we affirm.

I

Chapter 925 of the Laws of 1976 authorizes Prince George's County to levy a tax not to exceed 4% of the rent paid by lessees of "multifamily residential units" during the period of possession by the lessee. A "multifamily residential unit" is defined to include "any building ... operated as a single unit in which the landlord provides ... two or more rental dwelling units." The statute further permits the County to render the operator or owner of a multifamily residential unit personally liable for collection and remittance of the tax to the appropriate local authorities. The County may also require landlords to collect

---

2. The chancellor was of the opinion that all constitutional claims raised by the plaintiffs had been settled by a decision of the same circuit court in a 1975 case involving a constitutional challenge to the predecessor of the present Occupancy Tax, namely, Laws of 1975, ch. 897 and §§ 75-5 through 75-8 of the Code of Public Local Laws of Prince George's County. The latter tax expired on July 1, 1976, before the present tax took effect.

the Occupancy Tax as part of the tenant's monthly rental installment, and upon failure of a tenant to pay the tax may proceed against him as in an ordinary case for nonpayment of rent. The State Act specifically exempts from the operation of the tax families receiving a "housing subsidy."

The County Ordinance, enacted pursuant to the grant of authority in the State Act, imposed the maximum 4% tax on monthly rents charged for the use and occupancy of rental multifamily residential units. Under the Ordinance, landlords who fail to remit the tax are subject to criminal prosecution and fines up to $500.00. A civil penalty equal to ten times the unpaid tax plus interest is assessed against any landlord who refuses to collect the tax. Tenants failing to remit the tax may be guilty of a misdemeanor punishable by a fine not to exceed $500.00 or no more than three months in jail.

Although the State Act and County Ordinance are for the most part identical, the Ordinance supplements the Act in several respects. First, the Ordinance adds a definition of the term "rent" as "consideration paid or required to be paid by a tenant for the use or occupancy of any structure and appurtenance thereto, valued in money, ... *including utilities* ..." (emphasis added). Secondly, the Ordinance supplies a definition of the phrase "housing subsidy," as used in the State Act, to include "direct or indirect payments by the federal or state government, payable to either a tenant or to a landlord on behalf of a tenant where the amount is based on the tenant's income or ability to pay and used exclusively for the payment of rent." The Ordinance further provides that this *"term shall not include quarters allowances or similar military housing allowances."* (emphasis added).

II

Appellants contest the constitutionality of the Prince George's County Occupancy Tax on two grounds, both of which arise under the uniform taxation mandate of Article 15 of the Declaration of Rights. First, say appellants, the tax is infirm because it is a property tax on a tenant's leasehold

estate, which is not based on the actual worth of the possessory interest in the hands of the tenant.[3] Secondly, it is contended that the uniformity limitation of Article 15 is violated because the County Ordinance defines "rent" to include utilities charges; therefore, the tax unreasonably discriminates against those apartment dwellers whose monthly rental payments cover utilities, since they are compelled to pay a higher effective rate of tax than similarly situated tenants who do not pay utility fees together with their rent installments.

In its entirety, Article 15 of the Declaration of Rights presently provides:

> "That the levying of taxes by the poll is grievous and oppressive and ought to be prohibited; that paupers ought not to be assessed for the support of the government; that the General Assembly shall, by uniform rules, provide for the separate assessment, classification and sub-classification of land, improvements on land and personal property, as it may deem proper; and all taxes thereafter provided to be levied by the State for the support of the general State Government, and by the Counties and by the City of Baltimore for their respective purposes, shall be uniform within each class or sub-class of land, improvements on land and personal property which the respective taxing powers may have directed to be subjected to the tax levy; *yet fines, duties or taxes may properly and*

---

3. When first framed at the Constitutional Convention of 1776, Article 15 (then Article 13) contained the injunction that every citizen was to contribute "his proportion of public taxes for the support of the government according to his actual worth in real or personal property." Later, this language was interpreted as a mandatory limitation on the General Assembly's power to lay property taxes. State v. C. & P.R.R. Co., 40 Md. 22, 50 (1874). Although the "actual worth" requirement was deleted from the text of the Article by amendment in 1915, we have since indicated that the "ad valorem" limitation nevertheless remains implicit in the current formulation of the uniformity rule. Susquehanna Power Co. v. State Tax Comm'n, 159 Md. 334, 343, 151 A. 29 (1930), *aff'd*, 283 U. S. 291, 51 S. Ct. 434, 75 L. Ed. 1042 (1931). *See also* 37 Op. Att'y Gen'l Md. 425, 427 (1952); Lewis, *The Tax Articles of the Maryland Declaration of Rights*, 13 Md. L. Rev. 83, 102-03 (1953). For a discussion of the history of Article 15, *see* Lewis, *supra*. And *see* R. Hoffman, *A Spirit of Dissension — Economics, Politics & The Revolution in Maryland*, 208-09 (1973).

> *justly be imposed, or laid with a political view for
> the good government and benefit of the community.*
> (emphasis added).

Under the Article, taxes laid directly upon property, as such, must be equal, uniform and according to the actual worth of all property in the same class located within the State. *See State Tax Comm. v. Gales,* 222 Md. 543, 560, 161 A. 2d 676 (1960); *National Can Corp. v. Tax Comm.,* 220 Md. 418, 426, 153 A. 2d 287 (1959), *appeal dismissed,* 361 U. S. 534, 80 S. Ct. 586, 4 L.Ed.2d 538 (1960); *State v. P., W. & B.R.R. Co.,* 45 Md. 361, 378 (1876). As the current formulation of the Article makes clear, however, the requirement that taxes be equal and uniform applies only to property taxes, *Katzenberg v. Comptroller,* 263 Md. 189, 196-97, 282 A. 2d 465 (1971); A. Niles, *Maryland Constitutional Law* 32-34 (1915). As early as 1776, the framers of Article 15 expressly permitted the General Assembly to depart from the principle of uniformity in taxation where the particular revenue measure enacted was an excise, that is, a tax imposed or laid with a political view for the good government and benefit of the community. *Williams' Case,* 3 Bland. 186, 257 (1831); *accord, Oursler v. Tawes,* 178 Md. 471, 485-86, 13 A. 2d 763 (1940).

The keystone of appellants' challenge to the Prince George's County Occupancy Tax and the central issue of this appeal is whether the tax is a direct tax on the tenant's property or whether it constitutes an indirect excise tax on the privilege of using or occupying a rented multifamily residential unit. If the latter, our inquiry is at an end, since, as we have indicated, there are no uniformity or ad valorem restrictions on the Legislature's power to levy excise taxes.

Several preliminary observations are in order at this juncture. First, our decisions have acknowledged that a strong presumption exists in favor of the constitutionality of legislative enactments, *Department of Natural Res. v. Linchester Sand & Gravel Corp.,* 274 Md. 211, 218, 334 A. 2d 514 (1974); *Md. Bd. of Pharmacy v. Sav-a-Lot,* 270 Md. 103, 106, 311 A. 2d 242 (1973), including revenue measures such

as the County Occupancy Tax at issue here. *See Adm'r, Motor Veh. Adm. v. Vogt,* 267 Md. 660, 674, 299 A. 2d 1 (1973). Secondly, the Legislature's power of taxation is an inherent attribute of the sovereignty of the state, and the right of the Legislature to exercise it should seldom be questioned except in cases where it is plain that the power has been relinquished or where invocation of the power would clearly overstep a limitation placed on its exercise by either the federal or state constitution. *State v. C. & P.R.R. Co.,* 40 Md. 22, 44 (1874); *see State Tax Comm. v. Gales,* 222 Md. at 549.

The line that separates an excise tax from a property tax is a difficult one to draw, and courts have not fully succeeded in developing a truly useful definition of either concept. *Blaustein v. Tax Comm'n.,* 176 Md. 423, 426, 4 A. 2d 861 (1939). To draw that line here, we examine the designation placed upon the tax by the Legislature, the subject matter of the tax, and the incidents of the tax, *i.e.,* the manner in which it is assessed and the measure of the tax.

Although the nature of any tax should be determined by reference to its actual operation and practical effect, rather than by any particular descriptive language which may have been employed by the legislative body, *Herman v. M. & C.C. of Baltimore,* 189 Md. 191, 198, 55 A. 2d 491, 173 A.L.R. 1310 (1947), we are nevertheless cognizant of the rule that the declaration of the Legislature as to the character of a levy is entitled to considerable weight in our own independent determination. *American Nat'l v. M. & C.C.,* 245 Md. 23, 35, 224 A. 2d 883 (1966). Both the State enabling act and the County Ordinance denominate the tax as a "multifamily occupancy" tax. Furthermore, the Ordinance states specifically that the tax is levied "upon rents charged for the *use* and *occupancy* of rental multi-family residential units." (emphasis added). The term "rent" is defined in the Ordinance as "consideration paid or required to be paid by a tenant for the *use* or *occupancy* of any structure ..." (emphasis added), and a "rental dwelling unit" is denoted as "any structure ... which a landlord, for consideration,

provides for *use* as a residence." (emphasis added). Finally, the Ordinance provides that "in the event of a vacancy for a portion of the month the four percent (4%) tax shall be prorated for that portion of the month that the rental unit was occupied." At no point in either the State Act or the County Ordinance is there any indication that the tax was intended as a direct charge on a tenant's possessory estate. Thus, on its face, at least, the tax appears to be a levy on the *use* and *occupancy* of a dwelling rather than an assessment directly against any property interest in the tenant's hands.

The consensus of opinion appears to be that a property tax is a charge on the owner of property by reason of his ownership alone without regard to any use that might be made of it, *Bromley v. McCaughn*, 280 U. S. 124, 136, 50 S. Ct. 46, 74 L. Ed. 226 (1929); *Dawson v. Kentucky Distilleries Co.*, 255 U. S. 288, 294, 41 S. Ct. 272, 65 L. Ed. 638 (1921); *Flint v. Stone Tracy Co.*, 220 U. S. 107, 152, 31 S. Ct. 342, 55 L. Ed. 389 (1911); *Herman v. M. & C.C. of Baltimore*, 189 Md. at 197; a tax on the mere right to own or hold property is a property tax. *Flynn v. City & County of San Francisco*, 18 Cal. 2d 210, 115 P. 2d 3, 6 (1941).

An early definition of the term "excise tax" was propounded by Professor Cooley in his treatise on the law of taxation:

> "[Excises are] taxes laid upon the manufacture, sale or consumption of commodities within the country, upon licenses to pursue, certain occupations and upon corporate privileges." 1 T. Cooley, *The Law of Taxation* § 42 (4th ed. 1924).

*Accord, Herman v. M. & C.C. of Baltimore*, 189 Md. at 197; *see also* 2 W. Blackstone, *Commentaries* \*317-18 (Tucker ed. 1803).

More recently, courts have employed a more expanded definition. In *Continental Motors Corp. v. Township of Muskegon*, 376 Mich. 170, 135 N.W.2d 908, 911 (1965), an excise was defined as "a tax imposed upon the performance of an act, the engaging in an occupation, or the *enjoyment of a privilege.*" (emphasis added). *Accord, Village of Lombard*

*v. Illinois Bell Telephone Co.*, 405 Ill. 209, 90 N.E.2d 105, 108 (1950); *Callaway v. City of Overland Park*, 211 Kan. 646, 508 P. 2d 902, 907 (1973). Indeed, an excise is said to embrace every form of taxation that is not a burden directly imposed on persons or property. *Gila Meat Co. v. State*, 35 Ariz. 194, 276 P. 1, 2 (1929); *City of Glendale v. Trondsen*, 48 Cal. 2d 93, 308 P. 2d 1, 7 (1957).

Finally, the property tax and the excise tax may be differentiated by the methods used to impose them and to fix their amount. Thus, it has been held that where a tax is levied directly by the Legislature without assessment and is measured by the extent to which a privilege is exercised by a taxpayer without regard to the nature or value of his assets, it is an excise. Where, however, the tax is computed upon a valuation of the property and is assessed by assessors, and where the failure to pay the tax results in a lien against the property, it is a property tax, even though a privilege might be included in the valuation. *Mont. Co. v. Md. Soft Drink Ass'n,* 281 Md. 116, 127, 377 A. 2d 486 (1977); *Walker v. Bedford,* 93 Colo. 400, 26 P. 2d 1051, 1053 (1933); *City of DeLand v. Florida Public Service Co.*, 119 Fla. 804, 161 So. 735, 738 (1935). *See Society for Savings v. Coite*, 73 U. S. (6 Wall) 594, 610 (1868).

As we noted earlier, the County tax is a charge, at least nominally, on the privilege of using and occupying a rented multifamily residential dwelling. The Legislature has made no overt attempt to tax the underlying leasehold estate. The State enabling act authorizes imposition of the tax only during the "period of possession" by the tenant. Furthermore, the County Ordinance provides for an abatement of the tenant's liability during that portion of the month when the apartment is unoccupied. Thus, despite appellants' assertions to the contrary, a tenant appears to be responsible for the tax only when the residential dwelling is actually used or occupied by him.[4]

This Court has indicated that a tax on the use of property, as distinguished from a tax based on ownership exclusively,

---

4. We carefully refrain here from deciding what constitutes "use" or "occupancy" for purposes of the Occupancy Tax.

is in the nature of an excise. *Lane Corp. v. Comptroller*, 228 Md. 90, 94, 178 A. 2d 904 (1962). The privilege of using property is only one of the many incidents which make up the bundle of rights, powers, privileges and immunities, collectively regarded as property or ownership. *Henneford v. Silas Mason Co.*, 300 U. S. 577, 582, 57 S. Ct. 524, 81 L. Ed. 814 (1937). *See also Billings v. United States*, 232 U. S. 261, 280-81, 34 S. Ct. 421, 58 L. Ed. 596 (1914). As the Supreme Court stated in *Bromley v. McCaughn*, 280 U. S. at 136, "a tax imposed upon a particular use of property or the exercise of a single power incident to ownership, is an excise." The Occupancy Tax, then, is in name and effect a valid excise on the privilege of occupying a residential rental dwelling unit, since the tax falls on only one of the manifold attributes associated with ownership of a leasehold interest in property.

Our conclusion is buttressed by two decisions from Pennsylvania and New York upholding the constitutionality of taxes levied on the privilege of using and occupying commercial property. In *John Wanamaker, Philadelphia v. School District*, 441 Pa. 567, 274 A. 2d 524 (1971), the Supreme Court of Pennsylvania held that the Philadelphia Business Use and Occupancy Tax was a privilege tax and was therefore not subject to or violative of the uniformity clause of the Pennsylvania constitution. The Philadelphia ordinance imposed a tax of $1.25 per $100 of assessed value of real estate on the "use or occupancy of real estate within the School District . . . for the purpose of carrying on any business . . . or other commercial and industrial activity." The tax was levied against the user or occupier of real estate in addition to any ad valorem property taxes imposed on the owner of the property. The court stated:

> "The use and ownership of property are distinct and separate. The right to use property is just one of several rights incident to ownership.
>
> * * *
>
> "While economically the incidence of the tax is on the property itself, its legal incidence is on the

privilege of using, making it a true excise tax." *Id.* at 526, 527 (emphasis added).

A similar result was reached in *Ampco Printing-Adv. Offset Corp. v. City of New York,* 14 N.Y.2d 11, 247 N.Y.S.2d 865, 197 N.E.2d 285 (1963), *appeal dismissed,* 379 U. S. 5, 85 S. Ct. 47, 13 L.Ed.2d 21 (1964), where the New York City Commercial Rent or Occupancy Tax Law was challenged as invalid under a state constitutional provision requiring real estate taxes to be based on a percentage of the "average full valuation of taxable real estate." There, the New York Court of Appeals held that the occupancy tax was not one imposed on real estate. Plaintiffs in that case had argued that the economic impact of the tax was on the property thereby rendering the charge a tax on real estate. The court rejected the contention relying on *Bromley v. McCaughn,* 280 U. S. at 136, quoted earlier. The *Ampco* court also rejected the argument that the tax was an ad valorem tax on intangible personalty, saying that the city levy was "not based merely on ownership or possession, regardless of whether the property is used or not." 197 N.E.2d at 288. *Cf. Florida Revenue Comm'n v. Maas Bros., Inc.,* 226 So. 2d 849, 851 (Fla. App. 1969), *cert. denied,* 237 So. 2d 177 (Fla. 1970) (tax imposed on tenants for privilege of renting or leasing commercial offices or buildings is an excise tax).

Recently, the Internal Revenue Service has specifically ruled that the 1975 Prince George's County Occupancy Tax, which, for all intents and purposes, was identical to the 1976 version at issue here, was an excise tax and not a property tax deductible under section 164(a)(1) of the Internal Revenue Code permitting a federal income tax deduction for state, local and foreign property taxes paid or accrued. Rev. Rul. 75-558, 1975-2 C.B. 67. In reaching this conclusion, the Service relied heavily on a decision of the United States Tax Court in *Waxenberg v. Commissioner,* 62 T. C. 594 (1974). There, the court held that an English tax, the United Kingdom General Rate Act of 1967 ("Rates Tax"), was a non-deductible excise for purposes of I.R.C. § 164(a)(1). The English statute imposed a tax on the occupation of real

property. Occupiers of land were not assessed on the basis of the fair market value of the real estate; instead, they paid a tax based on a pro rata portion of the net annual rental value of the property, computed as a function of the period during which the taxpayer actually occupied the premises. The Tax Court concluded that the Rates Tax was "an excise on the privilege of occupying or using real property" and therefore not deductible as a property tax. Following the reasoning in *Waxenberg,* the Internal Revenue Service determined that the Prince George's Occupancy Tax was likewise a tax imposed on rents for the occupancy of the property. *See also* Rev. Rul. 73-600, 1973-2 C.B. 47 (declaring the United Kingdom Rates Tax to be a levy on the occupation and use of real property and not a tax on the property itself.)

Relying upon the decision of this Court in *Anne Arundel County v. English,* 182 Md. 514, 35 A. 2d 135, 150 A.L.R. 842 (1943), appellants here contend that a tax on the occupation or use of a residential dwelling, as opposed to a commercial building, is not a tax on a privilege at all, but rather a tax on a necessity of life, and is therefore the functional equivalent of a tax on ownership per se. They argue strenuously that the Occupancy Tax is not levied on an incident of ownership, but is instead a charge on a power so indispensable to the enjoyment of the ownership that a tax on it must be characterized as a property tax.

*English* involved a challenge to a "license" tax on mobile homes in Anne Arundel County imposed at a flat rate of $30.00 per annum per trailer, for the payment of which occupiers were primarily responsible. Failure to pay the tax resulted in a lien being placed on the trailer. Taxpayers there claimed the tax was invalid for two reasons. First, the tax was attacked as being arbitrary and invidiously discriminatory against owners and occupiers of residential trailers in violation of Article 23 of the Declaration of Rights and the Fourteenth Amendment of the Federal Constitution on the grounds that ordinary home-dwellers were not subject to a similar tax. Secondly, and most importantly for present purposes, the tax was said to contravene the

uniformity mandate of Article 15. The Court agreed with both contentions and struck down the tax with this rationale:

> "By no stretch of the imagination could occupying the trailer as a place of habitation be considered an occupation or a business. Everyone does not have to go in business but everyone has to have a home or shelter. Occupying a home is not a privilege. It is essentially a necessity. Here shelter is necessary to life itself. To meet this necessity the trailer is constructed as a place of habitation, and it is the principal use to which it can be put.
>
> \* \* \*
>
> "The tax in the instant case, being one upon one of the only uses of which the trailer is capable, namely as a place of habitation, is therefore a property tax." 182 Md. at 528, 530.

This Court, in holding the Anne Arundel trailer tax to be an invalid property tax, applied a restrictive definition of the term "excise" by confining it to a tax on the privilege of engaging in a business or occupation. As we observed earlier, however, the modern conception of an excise tax includes any tax not levied directly on the ownership of property as such. A tax on the use and enjoyment of a privilege appurtenant to property is, under this view, an excise, despite its close connection with the underlying property.

Nor do we find applicable here the reasoning in *English* that the Legislature is powerless to impose an excise tax on the privilege of occupying a place of habitation. There is nothing in the right to inhabit a shelter that would immunize it from the broad taxing power of the state. *See Carmichael v. Southern Coal & Coke Co.*, 301 U. S. 495, 508, 57 S. Ct. 868, 81 L. Ed. 1245 (1936) ("Taxes . . . are commonly levied on property or its use, but they may likewise be laid on the exercise of personal rights and privileges."). Cases from other jurisdictions decided subsequent to *English*

support the views expressed here. *Berry v. Costello,* 62 Ill. 2d 342, 341 N.E.2d 709, 711 (1976) ("The tax involved here is not simply a tax on the natural right to shelter and habitation. It is a tax on the privilege of owning an inhabited mobile home."); *Rapa v. Haines,* 64 Ohio Abs. 543, 113 N.E.2d 121, 122 (1952) (annual flat tax on residential trailers does not violate uniformity rule since tax is on the enjoyment of a privilege of using a trailer as a place of human habitation); *Barnes v. City of West Allis,* 275 Wis. 31, 81 N.W.2d 75, 79 (1957) (upholding constitutionality of mobile home parking tax under state uniformity clause). *Cf. Bucoda Trailer Park, Inc. v. State,* 17 Wash. App. 79, 561 P. 2d 1100 (1977) (sustaining application of sales tax to lease of mobile homes to private residents).

To be sure, the right to use and occupy a residential dwelling unit is the principal and undoubtedly the most valuable use to which the property may be put, but it is only one of several rights and privileges inuring to the benefit of the owner of the leasehold. Apart from *English,* we have been unable to locate any recent authority supporting appellants' view that a tax on the principal or most valuable use of property is in effect a tax on the property itself. To the extent, then, that it is inconsistent with our views here, *English* is now expressly overruled.

Nor is *Dawson v. Kentucky Distilleries Co.,* 255 U. S. 288, 41 S. Ct. 272, 65 L. Ed. 638 (1921), heavily relied upon by appellants, to the contrary. There, Kentucky imposed an annual license tax of 50¢ per gallon on all whiskey withdrawn from bond or transferred in bond from Kentucky out of state. Taxpayers contested the levy on the ground that it was an invalid property tax under Kentucky's uniformity clause. The state argued that the tax was a privilege tax on the right to remove whiskey from bonded warehouses. The Court disagreed and held the tax to be a non-uniform property assessment:

> "The whole value of the whiskey depends upon the owner's right to get it from the place *where the law has compelled* him to put it, and to tax the right is to tax the value." *Id.* at 294 (emphasis added).

Kentucky had forced the whiskey owners to place their product in the warehouses, taxed them on the value of the whiskey as property, and then attempted to impose yet another tax on the removal of the whiskey from bond, which removal, of course, was a necessity for the owners if they were to make use of their commodity. The Kentucky legislation was obviously designed to exact a double property tax by disguising the second levy as a privilege tax. There is clearly no parallel here. The tenants have not been coerced into residing in the multifamily rental units; they do so voluntarily. Thus, they have elected to exercise their privilege or right to occupy rental housing, and consequently subject themselves to the county tax imposed on the privilege to use and occupy such dwellings.

We note finally that the Occupancy Tax exhibits few if any of the attributes traditionally associated with a conventional property tax. First, the tax was imposed directly by the Legislature and the governing body of Prince George's County, neither of which made any provision for the assessment of the individual units as is commonly the case with a true property tax. Secondly, neither statute saddles the property directly with a lien in the event the tenant fails to remit the tax, although a lien might arise indirectly as a result of a landlord's suit for distress for nonpayment of rent, which, under the statute, includes the tax for enforcement purposes. Thirdly, the measure of the tax does not seem to be based on the value of the leasehold itself, but tends to reflect the extent to which the tenant has enjoyed and exercised his privilege to occupy the rental unit. *See Powell v. Gleason,* 50 Ariz. 542, 74 P. 2d 47, 50 (1937); *City of DeLand v. Florida Public Service Co.,* 161 So. at 738. Fourthly, unlike a property tax, the Occupancy Tax is not payable at a specified date, but is due as each rental payment is made much in the same way a retail sales tax is collected. *See Canton Co. v. Comptroller,* 231 Md. 294, 299, 190 A. 2d 92, *appeal dismissed,* 375 U. S. 58, 84 S. Ct. 173, 11 L.Ed.2d 122 (1963) (holding that since tenant's right of possession depends on periodic payment of rent, sales tax may be imposed on transaction, basis of tax being lessee's

continued right to possess leased property; each rental installment constitutes, in effect, separate lease transaction). *Accord, Gandy v. State,* 57 Wash. 2d 690, 359 P. 2d 302, 304 (1961).

Having considered the subject matter of the tax, its manner of assessment and the label placed upon it by the General Assembly, and in view of the presumption of constitutionality accorded legislative enactments in the area of revenue and taxation, we hold that the Prince George's County Occupancy Tax is an excise tax "imposed or laid with a political view for the good government and benefit of the community," and is therefore not subject to the uniformity and actual worth requirements mandated by Article 15 of the Declaration of Rights. Accordingly, appellants' constitutional claims must be rejected.

### III

Appellants' final point of attack on the Ordinance is that the County acted beyond the scope of the enabling statute in defining the term "housing subsidy," as used in the State Act, to exclude payments made to military personnel in the form of quarters allowances or similar military housing allowances. The effect of the County's action was to deny recipients of military housing allowances the benefit of the State Act's exemption in favor of families receiving a housing subsidy.

To the extent that the General Assembly made no attempt to delineate what is meant by the term "housing subsidy," it is incumbent upon this Court to ascertain the legislative intent. A term used in a statute which is not specifically there defined should be interpreted as having its ordinary and commonly accepted meaning. *Scoville Service, Inc. v. Comptroller,* 269 Md. 390, 395, 306 A. 2d 534 (1973). Furthermore, as stated in *Perdue, Inc. v. State Dep't of Assessment and Taxation,* 264 Md. 228, 232-33, 286 A. 2d 165 (1972):

> "It is fundamental that statutory tax exemptions are strictly construed in favor of the taxing

authority and if any real doubt exists as to the propriety of an exemption that doubt *must* be resolved in favor of the State. In other words, to doubt an exemption is to deny it." (emphasis in original).

The State's taxing power is never presumed to be relinquished and the abandonment of this power must be proved by the party asserting the exemption, *see id.* at 233.

The ordinary signification of the term "subsidy" is a grant of funds by a government or its proper agencies to a private person or entity to assist in the establishment or support of an enterprise or activity deemed advantageous to the public. *See, e.g., Los Angeles County v. State Dep't of Public Health,* 158 Cal. App.2d 425, 322 P. 2d 968, 973 (1958); 1 T. Cooley, *The Law of Taxation* § 52 (4th ed. 1924). It is manifest that the term subsidy can never be applied to include the notion of compensation. The former applies to a grant of funds, akin but not identical to a gratuity. Compensation, on the other hand, is that return which is given for something else. It applies primarily to a transaction between two or more persons and does not arise from a unilateral transaction, purpose or policy of one person or entity in the prosecution of an individual enterprise, *Kroger Grocery & Baking Co. v. City of Cynthiana,* 240 Ky. 701, 42 S.W.2d 904, 906 (1931).

The County contends, and we agree, that the Basic Allowance for Quarters (BAQ) is part of a military person's compensation, and is therefore not a subsidy. The statutory authorization for the military housing allowance is 37 U.S.C. § 403 (1970, Supp. V 1975). Section 403 (a) provides that:

"[A] member of a uniformed service who is entitled to basic pay is entitled to a basic allowance for quarters as the monthly rates prescribed in accordance with section 1009 of this title, *according to the pay grade in which he is assigned or distributed for basic pay purposes.*" (emphasis added).

Section 403(b) bars all personnel assigned to government housing appropriate to their rank and adequate for themselves and their dependents from receiving the BAQ. That section also permits a commissioned officer with a pay grade above "0-3" to elect not to be assigned to government housing and to receive the appropriate housing allowance in lieu thereof. Section 403(i) provides that the BAQ of an enlisted member with dependent shall not be contingent on the right of the member to receive basic pay. 37 U.S.C. § 1009(a)(3) (Supp. V 1975) requires the President to increase the basic allowance for quarters whenever the general schedule of compensation for federal classified employees under 5 U.S.C. § 5332 (1970) is adjusted upward. *See also* 32 C.F.R. § 715 (1976).

As stated by the Supreme Court in *Frontiero v. Richardson*, 411 U. S. 677, 679, 93 S. Ct. 1764, 36 L.Ed.2d 583 (1973), the congressional purpose in authorizing the military quarters allowance was "to attract career personnel through enlistments [by means of] a scheme for the provision of fringe benefits to members of the uniformed services on a competitive basis with business and industry." Thus, what began as a plan to mitigate the hardships of military service on the families of servicemen has evolved into a massive compensation system designed to make the military an attractive employment alternative to thousands of men and women in the labor market. The need for the military to develop a competitive compensation program was made even more pressing as a result of the government's decision to establish an all-volunteer force. Letter from General Counsel of the Department of Defense to President of the Senate, March 21, 1973, in S. Rep. No. 235, 93d Cong., 1st Sess. 18, *reprinted in* [1973] U.S. Code Cong. & Ad. News 1579, 1596. *See also* Letter of Assistant Secretary of Defense to President of Senate, March 30, 1973, in S. Rep. No. 1132, 93d Cong., 2d Sess. 11, *reprinted in* [1974] U.S. Code Cong. & Ad. News 5358, 5365-67.

Further evidence of the compensatory character of the Basic Allowances for Quarters may be found in 37 U.S.C.A. § 1009(b)-(d) (West Supp. 1976) in which the phrase

"element of compensation" is used to describe collectively the following items: monthly basic pay, basic allowance for subsistence and the *basic allowance for quarters*. 37 U.S.C. § 1009 was enacted for the first time in 1974 for the purpose of distributing military pay raises among each of the three elements of compensation in lieu of putting such raises solely into basic pay. By putting the increases into allowances as well as basic pay, it was the intent of Congress to "make the *compensation* system more understandable to military personnel in the future." (emphasis added). S. Rep. No. 1132, 93d Cong., 2d Sess. 2, *reprinted in* [1974] U. S. Code Cong. & Ad. News 5358, 5359. Furthermore, 37 U.S.C. § 101(25) (Supp. V 1975) defines the terms "regular compensation" and "regular military compensation (RMC)" as ". . . the total of the following elements that a member of a uniformed service accrues or receives, directly or indirectly in cash or in kind every payday: basic pay, *basic allowance for quarters*, basic allowance for subsistence, and federal tax advantage accruing to the aforementioned allowances because they are not subject to Federal income tax." (emphasis added).

In light of these recent enactments, it seems clear that Congress intended the basic allowance for quarters to be part of the total compensation paid to members of the armed forces. The BAQ is thus an element of the *quid pro quo* flowing from the federal government in exchange for the services of its military personnel. To this extent, the BAQ is indistinguishable from compensation paid to other federal employees and can in no way be considered a housing subsidy.

The few cases decided since 1942, which have considered the nature of the quarters allowance, have held the BAQ to be a form of compensation and not a government grant or gratuity. In *United States v. Elfer*, 246 F. 2d 941 (9th Cir. 1957), the government sued to recover an overpayment of a family allowance paid to the wife of a serviceman. In granting the wife's motion to dismiss for lack of a necessary party, the court held that family allowance payments under the Servicemen's Dependents Allowance Act of 1942, Ch.

443, 56 Stat. 381, were compensation and not a gratuity from the government to the wife. *Id.* at 944. *Accord, McLendon v. United States,* 191 F. Supp. 258 (E.D. N.Y. 1961) (former wife's suit to obtain her husband's quarters allowance was an action to recover *compensation* for official services of a federal employee and, therefore, dehors the subject matter jurisdiction of the district court under 28 U.S.C. § 1346(d)(2) (1970)); *Upton v. United States,* 203 F. Supp. 14 (S.D. N.Y. 1962). *See also Kipping v. Kipping,* 186 Tenn. 247, 209 S.W.2d 27 (1948); *Sterrett v. Sterrett,* 228 S.W.2d 341 (Tex. Civ. App. 1950).

In support of their position that the military quarters allowance provided for under 37 U.S.C. § 403 is a housing subsidy and not compensation, appellants note that commutation of quarters has never been considered as compensation by the Internal Revenue Service for purposes of computing gross income under I.R.C. § 61. As a result of the decision in *Jones v. United States,* 60 Ct. Cl. 552 (1925), the Service reversed its prior position and ruled that quarters allowances were excludible from gross income. I.T. 2219, IV-2 C.B. 41 (1925), later codified as Treas. Reg. 1.61-2 (b) (1960). The decision in *Jones* was based on a series of long-standing Army regulations which, in the court's view, created a right in favor of military officers to quarters, or commutation in lieu thereof, as a matter of public necessity. 60 Ct. Cl. at 569. The Court of Claims reasoned that officers are not paid salaries and furnished housing as compensation for their services; rather they are paid salaries as an incentive to live in quarters that are made available, 60 Ct. Cl. at 570. *See also* Rev. Rul. 55-572, 1955-2 C.B. 45.

Whatever may have been the validity of the *Jones* rationale in 1925, subsequent fundamental changes in the structure of the military compensation system, discussed earlier, have rendered that decision an anachronism. With the advent of an all-volunteer army, the inclusion of enlisted members in the class of personnel entitled to receive quarters allowances, and the integration of the military pay system into the General Schedule of compensation for classified federal employees, the nature of the quarters

allowance has been radically transformed from what it was prior to the passage of the Servicemen's Dependents Allowance Act of 1942. It is true that the IRS regulations continue to exempt quarters allowances from taxation under the income tax. This practice, however, can be best explained as a product of immemorial and unchanged usage upon which servicemen and Congress have relied for decades. It is interesting to note that the IRS has ruled that the payment of a basic quarters allowance to a contract surgeon with the Department of the Army constituted wages and was thus includible in the surgeon's gross income. Rev. Rul. 60-66, 1960-1 C.B. 21. This ruling would seem to indicate that tax-free treatment accorded servicemen is not based on any economic feature of the quarters allowance as such, but is the product of a non-tax, noneconomic policy decision on the part of the government to grant a special tax advantage to the nation's military personnel. Therefore, the practice of the Internal Revenue Service in not taxing the military quarters allowance lends little support, if any, to the argument advanced by appellants that military housing allowances are housing subsidies and not compensation.

It is our conclusion that military housing allowances are more appropriately classified as a form of compensation and therefore cannot be considered subsidies as that term has been defined. We hold that the natural and ordinary signification of the term "housing subsidy," as employed by the General Assembly in enacting Chapter 925 of the Laws of 1976, does not include the basic quarters allowance or any other form of military housing allowance authorized by Title 37 of the United States Code. Therefore, Prince George's County acted entirely within the bounds of its authority in excluding quarters allowances from the definition of "housing subsidy" in the Ordinance.

*Judgment affirmed; appellants to pay costs.*